CR 26-189 JMB

# EXHIBIT A

SCANNED
OCT 20 2026
U.S. DISTRICT COURT MPLS

Filed in District Court
State of Minnesota
5/18/2026

State of Minnesota
County of Hennepin

District Court
4th Judicial District

Prosecutor File No. 26A05307
Court File No. 27-CR-26-12537

**State of Minnesota,**

Plaintiff,

vs.

**CHRISTIAN J. CASTRO DOB: 12/26/1973**

MN

Defendant.

**COMPLAINT**

Warrant

The Complainant submits this complaint to the Court and states that there is probable cause to believe Defendant committed the following offense(s):

**COUNT I**

**Charge: Assault-2nd Degree-Dangerous Weapon**
Minnesota Statute: 609.222.1, with reference to: 609.222.1, 609.11.5(a)
Maximum Sentence: 7 YEARS AND/OR $4,200-$14,000
Offense Level: Felony

Offense Date (on or about): 01/14/2026

Control #(ICR#): 26000126

Charge Description: That on or about January 14, 2026, in Minneapolis, Hennepin County, Minnesota, Christian J. Castro, assaulted Victim 1 while using a firearm.
Minimum Sentence: 3 YEARS

**COUNT II**

**Charge: Assault-2nd Degree-Dangerous Weapon**
Minnesota Statute: 609.222.1, with reference to: 609.222.1, 609.11.5(a)
Maximum Sentence: 7 YEARS AND/OR $4,200-$14,000
Offense Level: Felony

Offense Date (on or about): 01/14/2026

Control #(ICR#): 26000126

Charge Description: That on or about January 14, 2026, in Minneapolis, Hennepin County, Minnesota, Christian J. Castro, assaulted Victim 2 while using a firearm.
Minimum Sentence: 3 YEARS

**COUNT III**

**Charge: Assault-2nd Degree-Dangerous Weapon**
Minnesota Statute: 609.222.1, with reference to: 609.222.1, 609.11.5(a)
Maximum Sentence: 7 YEARS AND/OR $4,200-$14,000

Filed in District Court
State of Minnesota
5/18/2026

Offense Level: Felony

Offense Date (on or about): 01/14/2026

Control #(ICR#): 26000126

Charge Description: That on or about January 14, 2026, in Minneapolis, Hennepin County, Minnesota, Christian J. Castro, assaulted Victim 3 while using a firearm.
Minimum Sentence: 3 YEARS

**COUNT IV**

**Charge: Assault-2nd Degree-Dangerous Weapon**
Minnesota Statute: 609.222.1, with reference to: 609.222.1, 609.11.5(a)
Maximum Sentence: 7 YEARS AND/OR $4,200-$14,000
Offense Level: Felony

Offense Date (on or about): 01/14/2026

Control #(ICR#): 26000126

Charge Description: That on or about January 14, 2026, in Minneapolis, Hennepin County, Minnesota, Christian J. Castro, assaulted Victim 4 while using a firearm.
Minimum Sentence: 3 YEARS

**COUNT V**

**Charge: Falsely Reporting Crime**
Minnesota Statute: 609.505.1, with reference to: 609.505.1
Maximum Sentence: 90 DAYS AND/OR $1,000
Offense Level: Misdemeanor

Offense Date (on or about): 01/14/2026

Control #(ICR#): 26000126

Charge Description: That on or about January 14, 2026, in Minneapolis, Hennepin County, Minnesota, Christian J. Castro informed a law enforcement officer that a crime had been committed, or otherwise provided information to an on-duty peace officer regarding the conduct of others, knowing that such information was false and intended that the officer act in reliance upon it.

Filed in District Court
State of Minnesota
5/18/2026

Complainant has investigated the facts and circumstances of this offense and believes the following establishes probable cause:

On January 14, 2026, at approximately 6:43:49 PM, the Minneapolis Police Department ("MPD") received a report from a 911 dispatcher that U.S. Immigration and Customs Enforcement ("ICE") agents were engaged in a vehicle pursuit of a male traveling in a Ford Focus and that the male, later identified as Victim 2, was attempting to reach his home, which was identified as XXX 24th Ave. N. in Minneapolis, Hennepin County, Minnesota. At 6:45 PM, MPD officers took remote-control of a city camera located at the intersection of Lyndale Ave. and 24th Ave. and pointed it at the home. The camera captured a series of events that culminated in an ICE agent, later identified as Christian Castro (hereinafter "Defendant"), firing a gunshot into the home, knowing it was occupied by multiple individuals, and injuring a male, later identified as Victim 1.

Video of Incident

The shooting of Victim 1 led to an investigation conducted by the Minnesota Bureau of Criminal Apprehension ("BCA"). As part of its investigation, the BCA recovered footage from the city camera at Lyndale and 24th, which captured the following events:

At 6:47 PM, Victim 1 stepped onto the front lawn of the home holding a snow shovel. At 6:48:36 PM, two vehicles arrived in the area and abruptly stopped approximately 100 feet east of the home. At 6:48:45 PM, Victim 2 emerged from the first vehicle and ran toward the home. Defendant emerged from the second vehicle and pursued Victim 2 on foot. At 6:48:50 PM, Victim 1 tossed the shovel onto the ground, where it remained throughout the incident, and stepped back toward the front door of the home. At 6:48:52 PM, Victim 2 reached the front of the home but slipped on the ground before he could reach the front door. At 6:48:55 PM, Defendant caught up to Victim 2, jumped on top of Victim 2, and engaged in a brief struggle with Victim 2 on the ground in front of the home. At 6:48:57 PM, Defendant rolled off Victim 2 and onto the ground while Defendant continued efforts to grasp onto Victim 2. At 6:49:01 PM, Victim 1 approached Victim 2 and reached down, appearing to separate Victim 2 from Defendant and help Victim 2 off the ground. At 6:49:04 PM, Victim 1 and Victim 2 ran to the front door of the home, out of camera-view at 6:49:06 PM. At 6:49:08 PM, Defendant got off the ground and stood several feet from the front door of the home, just as additional ICE vehicles were arriving on 24th Ave. approximately 100 feet east of the home. At 6:49:09 PM, as Defendant faced the front door of the home, Defendant raised both of his arms straight out in front of him, pointing toward the front door. Defendant's movements between 6:49:09 PM and 6:49:10 PM are consistent with Defendant firing a gun at the front door of the home. Defendant then stepped back and spoke to an arriving ICE agent.

Reports of Shooting, Statement of Victim 3, and Immediate Scene Response

Immediately after this incident, MPD received multiple reports of a single gunshot occurring in front of XXX 24th Ave. N. One of those reports was from "ShotSpotter," an acoustic gunshot detection system which utilizes a network of sensors installed in the city of Minneapolis to detect, locate, and alert MPD to gunfire in real-time. ShotSpotter reported that a single round was fired in front of XXX 24th Ave. N. at precisely 6:49:09 PM.

A separate report of the shooting came from a 911 caller who was inside the home at XXX 24th Ave. N. at the time of the gunshot. This individual, identified as Victim 3, reported that there were four adults and two children inside the home when an ICE agent shot into it. The adults in the residence referenced by Victim 3

were identified as Victims 1, 2, 3, and 4. Victim 3 explained that Victim 2 was chased to the home by ICE and that, once Victim 2 got into the home, ICE shot at them. Victim 3 emphasized that ICE shot at all of them and hit Victim 1 in the leg. Victim 3 further reported to the 911 dispatcher that ICE remained outside the home and was trying to gain entry.

At approximately 6:50 PM, MPD officers and paramedics began responding to the scene, where they encountered numerous ICE agents surrounding the home. ICE agents deployed tear gas, entered the home, and took Victims 1, 2, 3, and 4 into custody. Almost an hour later, at 7:48 PM, paramedics were allowed access to Victim 1 and transported him to North Memorial Hospital, where he was treated for a gunshot wound to the leg.

While on the scene, MPD contacted the BCA, reported that an ICE agent was involved in a shooting, and requested the BCA's assistance with the investigation. BCA investigators deployed to the scene and to North Memorial Hospital.

Interview of ICE Agent 1

At the scene, BCA investigators encountered Federal Bureau of Investigation ("FBI") agents who agreed to conduct a joint investigation into the shooting, and, at 8:36 PM, personnel from the two agencies conducted a joint video-recorded interview with an ICE agent (hereinafter "ICE Agent 1").

ICE Agent 1 stated that he, Defendant, and two other agents (hereinafter "ICE Agent 2" and "ICE Agent 3") pursued Victim 2 for 7-10 minutes on the highways and streets of Minneapolis to XXX 24th Ave. N. ICE Agent 1 stated that the pursuit began after ICE "ran a background information on somebody and . . . made sure that the person was apprehendable." ICE Agent 1 stated that Defendant was the initial pursuer of the vehicle and that Defendant arrived at the victims' home before ICE Agent 1 arrived. ICE Agent 1 stated that the shooting occurred just before ICE Agent 1 arrived. Upon arrival, ICE Agent 1 said that he had a verbal exchange with Defendant. ICE Agent 1 described the exchange: "[Defendant] had told us that the two individuals came outside with the shovel and the broom had smacked him with it, got him on the ground, hit him with it, and of course, [Defendant] shot one round. He wasn't sure if he hit anybody. They had already shut the doors on us." ICE Agent 1 explained that the occupants of the home refused to exit, so ICE breached the house. ICE Agent 1 provided the names and cellphone numbers of ten ICE agents who were part of his team, and the list included the names of Defendant, ICE Agent 1, ICE Agent 2, and ICE Agent 3. ICE Agent 1 unambiguously identified Defendant as the shooter.

Soon after conducting the interview of ICE Agent 1, FBI agents at the scene informed the BCA that they had been directed to cease working with the BCA and that no further interviews would be conducted at the scene. At that point, federal authorities stymied all further efforts by the BCA to interview additional ICE agents or Defendant himself. To date, federal authorities have prevented any further interviews of involved federal agents.

Statement of Victim 1 and Documentation of Victim 1's Gunshot Wound

At 8:26 PM on January 14, 2026, BCA investigators arrived at North Memorial Hospital, where they spoke to Victim 1. Victim 1 explained that he lived at XXX 24th Ave. N. with Victims 2, 3, and 4, and two young children. Prior to the shooting, Victim 1 was at home and received a call from Victim 2. Victim 1 stated that Victim 2 reported to him that, while Victim 2 was working for DoorDash, he encountered ICE agents, who began pursuing him in an unmarked pickup truck. Victim 1 stated that, out of fear, Victim 2 did not stop his vehicle and attempted to evade the agents and get back to his home. Victim 1 stated that, as Victim 2 approached the home, Victim 1 exited the home and witnessed Victim 2's arrival. Victim 1 saw Victim 2 exit his vehicle and run toward the home, followed by a single ICE agent. Victim 1 saw the ICE agent catch

Victim 2 and struggle with Victim 2. Victim 1 intervened by pulling Victim 2 away from the agent, and Victim 2 broke free. The agent attempted to grab Victim 2 again. Victim 1 offered that, at that point, Victim 1 swung a broom at the agent, but Victim 1 did not strike the agent. Victim 1 and Victim 2 then ran into the home. Victim 1 stated that, as he stood inside the home, behind the front door, and while attempting to close and lock the door, Victim 1 heard a loud gunshot and was shot in his right leg. Victim 1 and Victim 2 then fled upstairs and attempted to barricade themselves inside the home, at which point ICE agents broke windows, deployed pepper spray inside the home, and took him and the other occupants of the home into custody.

While speaking to Victim 1 at the hospital, BCA investigators photographed an acute gunshot wound to Victim 1's right leg and obtained Victim 1's medical records. They observed and documented with a ruler that, in a standing position, Victim 1's gunshot wound was 32 inches from the ground.

Statement of Victim 2

BCA investigators spoke to Victim 2, who explained that, prior to the shooting, Victim 2 was delivering meals for DoorDash and observed a vehicle pull up next to him. Based on the appearances of the occupants of the other vehicle, Victim 2 surmised that they were associated with ICE. Those occupants pointed at Victim 2 from inside their vehicle and maneuvered their vehicle to try to block him. Victim 2 explained that he feared for his life, so he drove away. The ICE agents pursued Victim 2 for what he estimated to be 25 minutes. During the pursuit, Victim 2 called Victim 1 and decided to drive home. Once Victim 2 arrived on 24th Ave., Victim 2 exited his car and ran toward his house. ICE agents stopped behind Victim 2's vehicle, and one agent ran after him. At that point, Victim 2 saw Victim 1, Victim 3, and Victim 4 standing in the foyer inside the front door of the home.

Victim 2 stated that he slipped on the ice in front of his home, and the ICE agent tackled Victim 2, causing them both to fall to the ground. Victim 2 stated that he did not punch or assault the agent and that Victim 2 was just trying to get away from him. Victim 2 was able to break free, stand up, and grab a broom. Victim 2 held the broom briefly like a baseball bat facing the agent, but Victim 2 did not swing it and threw it down on the ground. Victim 2 and Victim 1 then ran into the home. Once inside, Victim 2 observed Victims 3 and 4 begin to run up the stairs and saw Victim 1 standing behind the front door, locking the door. At that moment, Victim 2 heard a single gunshot coming from outside the home and observed that Victim 1 was shot in the leg. The four victims then ran upstairs and barricaded themselves in a room. Soon after, ICE agents threw tear gas into the home, entered, and took everyone into custody.

Statement of Victim 4

BCA investigators spoke to Victim 4, who explained that, prior to the shooting, Victim 2 called to explain to Victims 1, 3, and 4 that ICE was chasing him and that he was coming home. In response, they called 911 and went down to the front of their home to wait for Victim 2 to arrive. Victim 2 arrived and ran toward the home, chased by a single ICE agent. Victim 4 saw that the ICE agent grabbed Victim 2, and Victim 1 went out to separate Victim 2 from the ICE agent. Victim 2 was able to get away from the ICE agent, and Victim 1 and Victim 2 ran back inside the home. At that moment, Victim 3 and Victim 4 were standing on the staircase within sight of the front door. Victim 1 was in the process of closing and locking the door when Victim 4 heard one gunshot. They all ran upstairs, and Victim 4 observed that Victim 1 was shot in the right leg. The victims immediately called 911 again and remained in the house until ICE shot tear gas into the house, breached the door, and arrested everyone.

Statement of Defendant at Cambridge Medical Center

BCA investigators learned that, on the night of the shooting, Defendant traveled by private vehicle to the

Cambridge Medical Center in Cambridge, MN, where at 8:44 PM Defendant underwent a medical examination, which included radiographic imaging. At that time, Defendant claimed that, while in the process of trying to detain a suspect, "other persons" came and started hitting Defendant with a broom and a snow shovel. Defendant claimed that these people were trying to hit him in the head, and that Defendant was hit twice in the head with the shovel, but that he did a "good job" of blocking the blows by covering his head.

While Defendant's account of events mirrored the account he provided to ICE Agent 1 at the scene, this account is not corroborated by the video of the incident or the accounts of Victims 1, 2, 3, or 4. Medical records document that Defendant suffered no demonstrable trauma to his body except for an abrasion to his left hand at the base of his thumb. The abrasion was cleaned off, and Defendant was discharged at 10:52 PM.

Collection and Review of Physical Evidence

Forensic scientists from the BCA responded to XXX 24th Ave. N to document the scene and collect physical evidence. They collected a shovel from the front yard, where the video from the city camera revealed Victim 1 had thrown it prior to Defendant arriving, a 9mm caliber discharged cartridge casing from the ground outside the front entrance of the home, a broom from the front step outside the entrance of the home, and another broom in the foyer. They observed a single bullet hole in the front door of the home. The hole was approximately 36.5 inches from the cement slab outside the residence and approximately 28 inches from the floor of the foyer inside the residence. Across the foyer from the front door, forensic scientists located additional defects in the residence that were consistent with a projectile passing through the front door, across the foyer, and then through the foyer wall, a closet, and a bedroom wall, where the projectile came to a rest. A single projectile was located inside the bedroom wall. The projectile was examined and determined to be consistent with being a jacketed hollow-point bullet fired by a 9mm caliber firearm. Utilizing physical and photographic evidence, forensic scientists conducted a trajectory analysis, finding that "the shot that fired the projectile originated outside of the duplex building, south of the front main door and traveled approximately south to north at a downward angle."

Defendant's Statement to FBI

BCA investigators learned that, following the incident, Defendant spoke to FBI agents about the incident. A summary of Defendant's statement to the FBI was included in an affidavit signed by an FBI agent on January 16, 2026. In the affidavit, Defendant (identified as ERO #1 therein) reported that he was driving an unmarked vehicle with another agent in his passenger seat. They observed a Ford Focus, ran its license plate through ICE databases, and concluded that the registered owner of the vehicle was not a United States citizen. Defendant attempted a traffic stop, but the vehicle fled. Defendant stated that he engaged in a high-speed pursuit of the vehicle with his lights and sirens activated for 15-20 minutes until the pursuit concluded with the vehicle's driver, Victim 2, coming to a stop on 24th Ave. N and running toward his home. Defendant stated that he exited his vehicle and chased Victim 2 on foot. Defendant stated that he saw a separate male, Victim 1, standing on the porch of the home and heard him yelling at Victim 2 to run faster. Victim 2 then slipped and fell on the ground, and Defendant grabbed Victim 2 to attempt to detain him.

According to the FBI affidavit, Defendant claimed to the FBI that, at that point, Victim 1 grabbed a broom and began striking him in the face and then a third male approached him with a snow shovel and began striking him with the shovel. Defendant claimed that, while being assaulted with a broom and a shovel by two assailants, he continued to tussle with Victim 2. According to the FBI affidavit, Defendant reported that he struggled with the three men "for about three minutes, was exhausted, alone, on the ground, and in fear of his safety." Victim 2 then freed himself and, according to Defendant, gave him an "angry scowl." Victim 1 then passed the broom to Victim 2, and, according to Defendant's account in the FBI affidavit, Victim 2

struck Defendant repeatedly in the face or head with the broom while Defendant was lying on his back on the ground. Defendant claimed that he tried blocking the blows with his left hand while drawing his service pistol with his right hand. He then pulled out his service pistol and pointed it in the direction of the three assailants. According to the FBI affidavit, Defendant claimed that, once Defendant pointed his pistol at the three assailants, they began running toward the front door of the home. Before they could enter the home, Defendant claimed, he fired one shot at them, unsure of whether he struck anyone. According to Defendant, after he fired the shot, the assailants ran inside and closed the front door.

Defendant's account to the FBI resembles his account to ICE Agent 1 and his account at the Cambridge Hospital. However, his account is contradicted by the video of the incident, the accounts of Victims 1, 2, 3, and 4, and the physical evidence.

Initiation and Abandonment of Federal Prosecution of Victim 1 and Victim 2

On January 16, 2026, the United States Attorney's Office for the District of Minnesota filed the FBI affidavit which summarized Defendant's claims in the United States District Court for the District of Minnesota in support of federal felony assault charges against Victim 1 and Victim 2. Following several court appearances in the criminal proceedings against Victim 1 and Victim 2, on February 11, 2026, United States Attorney Daniel N. Rosen moved to dismiss all charges against Victim 1 and Victim 2, acknowledging that "[n]ewly discovered evidence is materially inconsistent with the allegations in the Complaint Affidavit," and stating that "dismissal with prejudice will serve the interests of justice." On February 13, 2026, District Court Judge Paul A. Magnuson dismissed those charges against Victim 1 and Victim 2.

Further investigation revealed that, at the time of the shooting, Victim 1 and Victim 2 were residing in Minnesota lawfully, having been granted "Temporary Protected Status" by the United States Department of Homeland Security.

Statements of Victims to FBI

BCA investigators are aware that FBI agents spoke to multiple other witnesses to the shooting on January 14, 2026, and conducted separate interviews with Victims 1, 2, 3, and 4. The aforementioned FBI affidavit, which was filed on January 16, 2026, included summaries of the victims' statements to the FBI. To the extent that the content of the victims' statements can be gleaned from the affidavit, Victims 1, 2, 3, and 4 separately provided statements to the FBI which report that all of the victims were at the threshold of their home when Defendant attempted to apprehend Victim 2 but that they were inside the home behind the front door when Defendant shot at them through the door. As to the particulars of their statements, despite repeated and standing requests from the BCA, the federal authorities have refused to provide the BCA access to any record or report of the interviews and to all other evidence exclusively in the possession of the federal government.

A warrant for Defendant's arrest is necessary because his whereabouts are unknown and there is a substantial likelihood that Defendant will not respond to a summons.

Filed in District Court
State of Minnesota
5/18/2026

## SIGNATURES AND APPROVALS

Complainant requests that Defendant, subject to bail or conditions of release, be:
(1) arrested or that other lawful steps be taken to obtain Defendant's appearance in court; or
(2) detained, if already in custody, pending further proceedings; and that said Defendant otherwise be dealt with according to law.

Complainant declares under penalty of perjury that everything stated in this document is true and correct. Minn. Stat. § 358.116; Minn. R. Crim. P. 2.01, subds. 1, 2.

| | | |
|---|---|---|
| **Complainant** | Nicolai Lyfoung<br>Special Agent<br>1430 Maryland Avenue E<br>St. Paul, MN 55106<br>Badge: 1456 | Electronically Signed:<br>05/18/2026 12:04 PM<br>Ramsey County, Minnesota |

Being authorized to prosecute the offenses charged, I approve this complaint.

| | | |
|---|---|---|
| **Prosecuting Attorney** | Joshua Larson<br>300 S 6th St<br>Minneapolis, MN 55487<br>(612) 348-5550 | Electronically Signed:<br>05/18/2026 12:00 PM |

MINNESOTA JUDICIAL BRANCH

Filed in District Court
State of Minnesota
5/18/2026

## FINDING OF PROBABLE CAUSE

From the above sworn facts, and any supporting affidavits or supplemental sworn testimony, I, the Issuing Officer, have determined that probable cause exists to support, subject to bail or conditions of release where applicable, Defendant's arrest or other lawful steps be taken to obtain Defendant's appearance in court, or Defendant's detention, if already in custody, pending further proceedings. Defendant is therefore charged with the above-stated offense(s).

## ☐ SUMMONS

THEREFORE YOU, THE DEFENDANT, ARE SUMMONED to appear as directed in the Notice of Hearing before the above-named court to answer this complaint.

IF YOU FAIL TO APPEAR in response to this SUMMONS, a WARRANT FOR YOUR ARREST shall be issued.

## ☒ WARRANT

To the Sheriff of the above-named county; or other person authorized to execute this warrant: I order, in the name of the State of Minnesota, that the Defendant be apprehended and arrested without delay and brought promptly before the court (if in session), and if not, before a Judge or Judicial Officer of such court without unnecessary delay, and in any event not later than 36 hours after the arrest or as soon as such Judge or Judicial Officer is available to be dealt with according to law.

☐ ***Execute in MN Only*** ☒ ***Execute Nationwide*** ☐ ***Execute in Border States***

## ☐ ORDER OF DETENTION

Since the Defendant is already in custody, I order, subject to bail or conditions of release, that the Defendant continue to be detained pending further proceedings.

Bail: $200,000.00
Conditions of Release: No Contact with Witnesses; No Possession of Weapons; Make All Appearances; Remain Law Abiding; Surrender Passport

This complaint, duly subscribed and sworn to or signed under penalty of perjury, is issued by the undersigned Judicial Officer as of the following date: May 18, 2026.

| | | |
|---|---|---|
| **Judicial Officer** | Paul R Scoggin<br>District Court Judge | Electronically Signed: 05/18/2026 12:17 PM |

Sworn testimony has been given before the Judicial Officer by the following witnesses:

| | |
|---|---|
| **COUNTY OF HENNEPIN**<br>**STATE OF MINNESOTA**<br><br>**State of Minnesota**<br>Plaintiff<br>vs.<br>**Christian J. Castro**<br>Defendant | *LAW ENFORCEMENT OFFICER RETURN OF SERVICE*<br>*I hereby Certify and Return that I have served a copy of this Warrant upon the Defendant herein named.*<br>Signature of Authorized Service Agent: |

27-CR-26-12537

Filed in District Court
State of Minnesota
5/18/2026

# DEFENDANT FACT SHEET

| | |
|---|---|
| **Name:** | Christian J. Castro |
| **DOB:** | 12/26/1973 |
| **Address:** | MN |
| **Alias Names/DOB:** | |
| **SID:** | |
| **Height:** | |
| **Weight:** | |
| **Eye Color:** | |
| **Hair Color:** | |
| **Gender:** | MALE |
| **Race:** | Unknown |
| **Fingerprints Required per Statute:** | Yes |
| **Fingerprint match to Criminal History Record:** | No |
| **Driver's License #:** | |
| **SILS Person ID #:** | 974462 |
| **SILS Tracking No.** | 3525561 |
| **Case Scheduling Information:** | RUSH WARRANT |
| **Alcohol Concentration:** | |

MINNESOTA JUDICIAL BRANCH

## STATUTE AND OFFENSE GRID

Filed in District Court
State of Minnesota
5/18/2026

| Cnt Nbr | Statute Type | Offense Date(s) | Statute Nbrs and Descriptions | Offense Level | MOC | GOC | Controlling Agencies | Case Numbers |
|---|---|---|---|---|---|---|---|---|
| 1 | Charge | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2323 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.11.5(a) Minimum Sentences of Imprisonment-Firearm Use or Possession | Felony | A2323 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2323 | | MNBCA0000 | 26000126 |
| 2 | Charge | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2423 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.11.5(a) Minimum Sentences of Imprisonment-Firearm Use or Possession | Felony | A2423 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2423 | | MNBCA0000 | 26000126 |
| 3 | Charge | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2423 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.11.5(a) Minimum Sentences of Imprisonment-Firearm Use or Possession | Felony | A2423 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2423 | | MNBCA0000 | 26000126 |
| 4 | Charge | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2423 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.11.5(a) Minimum Sentences of Imprisonment-Firearm Use or Possession | Felony | A2423 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2423 | | MNBCA0000 | 26000126 |
| 5 | Charge | 1/14/2026 | 609.505.1 Falsely Reporting Crime | Misdemeanor | X3190 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.505.1 Falsely Reporting Crime | Misdemeanor | X3190 | | MNBCA0000 | 26000126 |

**EXHIBIT B**

Filed in District Court
State of Minnesota
9/15/2026 7:17 PM

STATE OF MINNESOTA | DISTRICT COURT
COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT

CERTIFICATE OF REPRESENTATION

State of Minnesota,

Plaintiff,

Vs. Case No. 27-Cr-26-12537

Christian J. Castro,

Defendant.

I, Daniel L. Gerdts
A.R. #207329
331 Second Ave S, Ste. 705
Minneapolis, Minnesota 55401
(612) 800-5086
daniel@danielgerdtslaw.com

hereby certify that I represent the above-named defendant on the following matter or matters before the court:

CHARGES: 2nd Degree Assault, Falsely reporting crime

I understand that I cannot withdraw from this representation unless said withdrawal is approved by the court after hearing on a written motion pursuant to Rule 703 of the General Rules of Practice for the District Courts.

Date: 15 September 2026

s/ Daniel L. Gerdts
Daniel L. Gerdts

# EXHIBIT C

The face of this document has microprinting and "VOID" when copied. Paper has a printed watermark, invisible fibers, and coin reactive authentication.

2026-FF-001421

Only the Original Power of Attorney will bind this surety.

# POWER OF ATTORNEY
## LEXINGTON NATIONAL INSURANCE CORPORATION

P.O. Box 6098, Lutherville, Maryland 21094 • 410-625-0800
info@lexingtonnational.com

Power No. 2026-FF- 001421

THIS POWER OF ATTORNEY NULL AND VOID UNLESS USED BEFORE 1/1/27

*KNOW ALL MEN BY THESE PRESENTS, that LEXINGTON NATIONAL INSURANCE CORPORATION, a corporation duly organized and existing under the laws of the State of Florida, hereby constitutes and appoints, subject to any General Qualifying Power of Attorney or other legal prerequisite, as its true and lawful attorney-in-fact the person signing below as Attorney-in-Fact, with full power and authority to sign the Company's name and affix it's corporate seal to, and deliver on its behalf as surety, any and all obligations as herein provided, and the execution of such obligations in pursuance of these presents shall be as binding upon the Company as fully and to all intents and purposes as if done by the regularly elected officers of the Company at its home office in their own proper person; and the Company hereby ratifies and confirms all and whatsoever its attorney-in-fact may lawfully do and perform in the premises by virtue of these presents.*

THE OBLIGATION OF THE COMPANY SHALL NOT EXCEED THE SUM OF TWO HUNDRED FIFTY THOUSAND TWENTY FIVE DOLLARS (250,025.00). THIS POWER OF ATTORNEY IS VOID IF ALTERED OR ERASED, VOID IF USED TO FURNISH BAIL ON THE SUBJECT BOND IN EXCESS OF THE STATED MAXIMUM AMOUNT OF THIS POWER AND VOID IF USED WITH OTHER POWERS OF THIS COMPANY OR OTHER POWERS OF OTHER COMPANIES TO MAKE BAIL ON THE SUBJECT BOND. EACH POWER OF ATTORNEY CAN ONLY BE USED ONCE AND MAY BE EXECUTED ONLY FOR RECOGNIZANCE ON CRIMINAL BAIL BONDS.

Bond Amount: $ 200,000

**NOT VALID FOR IMMIGRATION BONDS**

Defendant: Christian J. Castro

First Court Date: ______ Case Number: 27 CR 26 12537

Defendant's Address: ______

Court: Hennepin County/City: Hennepin

Offense(s): Assault - 2nd

Date of Execution: 9·16·26 Court Assigned Agent #: ______

Attorney-in-Fact: Dillon Mclellan (Print Name) [signature] (Signature)

IN WITNESS WHEREOF, LEXINGTON NATIONAL INSURANCE CORPORATION, by virtue of authority conferred by its Board of Directors, has caused these presents to be sealed with its corporate seal, signed by its Chief Executive Officer and attested by its Secretary on April 9, 1996.

[signature] Chief Executive Officer

[signature] Secretary

LEXINGTON NATIONAL INSURANCE CORP. STATE OF FLORIDA 1989

1. A separate Power of Attorney must be attached to each bond executed.
2. Powers of Attorney must not be returned to attorney-in-fact, but should remain in a permanent part of court records.
3. The authority of such attorney-in-fact is limited to appearance bonds and cannot be construed to guarantee defendant's future lawful conduct, adherence to release conditions, travel limitations, payment of fines, restitution, or penalties, or any other conditions imposed by a court not specifically related to court appearance.

Form # LNIC-Bail-95

Filed in District Court
State of Minnesota

SEP 16 2026

# BAIL BOND FORM – APPEARANCE ONLY (also known as FORM 702)

STATE OF MINNESOTA, *Plaintiff* Court File No.: 27 CR 2612537

v.

Christian J. Castro , *Defendant*

Filed in Hennepin County District Court Bond Amount two Hundred thousand ($ 200,000 )

Charges: Assault - 2nd

(including amendments and lesser included charges)

## BOND OBLIGATION AND CONDITIONS

The Defendant, as Principal, Christian J. Castro (print name) and Lexington National Insurance Corporation (print name), as Surety, hereby agree and acknowledge that they are indebted to pay to the above named District Court the Bond Amount if the Defendant fails to personally appear in Court at such times and on such dates as specified by the Court to answer the charge(s) identified in this Bond, including any amendments of these charges or lesser included charges.

The obligation of the Surety becomes null and void upon the occurrence of any of the following events:

1. The dismissal of the charge(s) identified on this form and accompanying Bond;
2. The finding or verdict that Defendant is not guilty of the charge(s) identified on this form and accompanying Bond; or
3. The sentencing of Defendant (whether imposed or stayed) with respect to the charge(s) identified on this form and accompanying Bond.

This is an appearance bond only and does not guarantee compliance with conditional release requirements imposed upon the Defendant by the Court. This bond shall not be used for payment of any fines, surcharges, costs, or other financial obligation(s) imposed upon the Defendant by the Court.

C. J. Castro — Christian J. Castro — 17 Sept 26

Defendant/Principal signature — Printed Name — Date

[signature] — Dillon McMullen — 9.16.26

Attorney in Fact for Surety Company (Bail Bond Agent) signature — Printed Name — Date

## ACKNOWLEDGMENT OF SURETY RELATIONSHIP

**This instrument remains valid for 180 days after the date signed below by the Bail Bond Agency (e.g., Owner/President/CEO).**

This instrument acknowledges that the above-named Attorney in Fact, Dillon McMullen (651-419-9999) **(print name)**

is employed by Midwest Bonding, LLC (Bonding Agency) and is authorized to post bonds

on behalf of Lexington National Insurance Corporation (Surety Company).

[signature] — Vice President — 05/01/2026

Bail Bond Agency (e.g., Owner/President/CEO) — Job Title — Date

**EXHIBIT D**

STATE OF MINNESOTA
COUNTY OF HENNEPIN

**Filed in District Court**
**State of Minnesota**

SEP 17 2026

DISTRICT COURT
FOURTH JUDICIAL DISTRICT

State of Minnesota
v.

Christian Castro

Case: 27-CR-26-12537

DOB (SILS):
Charge: 2° Assault and others

## CONDITIONAL RELEASE ORDER

☐ New Order ☐ Amended Order

**You are released on any of the following marked options (and marked conditions):**

☒ Post bail/bond of $ 400,000 with no conditions. ☒ Post bail/bond of $ 200,000 with the following conditions.
☐ Post cash bail of $_________ with no conditions. ☐ Post cash bail of $_________ with the following conditions.
☐ You are released with no bond, bail, or conditions. ☐ You are released with no bail on the following conditions.

1. ☒ Obey all laws. 11/3 ~~7:30~~ 1:00
2. ☒ Attend all court appearances and appointments with Psychological Services and Probation, including any Pre-Sentence Investigation interview.
3. ☒ Do not have direct or indirect contact (including through social media) with any witness in this case.
Stay away from a three-block radius of any such person and where they live, work, or go to school,
☐ except with a police escort to recover your clothing, prescriptions, electronics, and toiletries.
☐ except to facilitate parenting time/child-care, for which ☐ contact through _______________, or ☐ written contact is permitted.
4. ☐ Stay away from _______________
5. ☒ Do not possess any firearm or ammunition ☒ or other item used as a weapon.
6. ☐ You cannot leave Minnesota without court permission.
7. ☒ Surrender passport, sign a waiver of extradition satisfying similar
8. ☒ Satisfaction of passport and EHM may be satisfied by PTED conditions

*The following marked conditions require supervision by Probation. Sign releases to confirm your compliance.*

9. ☒ Your release will be supervised. Contact your assigned Probation Officer within 48 hours of release. If you need help contacting your Probation Officer, call 612-348-3218. Notify your Probation Officer of any changes to your contact information.
10. ☐ Complete an in-custody substance use disorder assessment with Probation Officer collateral. Follow recommendations.
You are released: ☐ upon completion of the assessment interview ☐ to recommended treatment without posting bond/bail ☐ only upon court order.
11. ☐ Within _____ days of release, complete a substance use disorder assessment with Probation Officer collateral. Follow recommendations.
12. ☐ Do not use any alcohol or non-prescribed controlled substance; provide a list of all medications to your supervising officer.
☐ You are subject to ☐ random testing and/or ☐ Remote Electronic Alcohol Monitoring (REAM) at your expense.
You must report to REAM within 24 hours. You are approved for REAM step-down after 60 days of no violations regarding use and testing, consistent with policies of conditional release, unless this box is checked: ☐
13. ☒ You must remain on Electronic Home Monitoring (EHM) and follow EHM rules. If eligible, you are approved for immediate work/school release and furloughs for job-seeking, medical care/treatment, legal meetings, and court. Your supervising officer may approve additional furloughs. When EHM concludes, you must return the base station and other equipment.
☐ You will remain in custody until placed on EHM.
☐ You must go to Client and Community Restoration at 3000 2nd Street North, Minneapolis, on _________ to activate EHM.
14. ☒ If D needs passport back or goes off EHM must immediately surrender passport and go on EHM in state proceeding

Internal Use Only (as needed):
REVIEWED WITH DEFENDANT WHO WAS RELEASED TO:
☐ Self ☐ Treatment ☐ Other _______________
*Signatures:*
*Probation Officer* _______________ *Date* _______
*Deputy* _______________ *Date* _______

[signature] 9/17/26
*Judge* *Date*

**Served by HCSO**

*Defendant* *Date*

HC 2921 (03/2026)

**EXHIBIT E**

Filed in District Court
State of Minnesota

SEP 17 2026

| | |
|---|---|
| **STATE OF MINNESOTA** | **DISTRICT COURT** |
| **COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT** |

State of Minnesota,

Plaintiff,

vs.

Christian J. Castro,

Defendant.

**PRE-SIGNED WAIVER OF EXTRADITION HEARING**

Court Case No. 27-CR-26-12537
C.A. Case No. 26A05307

---

I, Christian J. Castro, having been informed by the judge before whom this waiver is executed, of my rights to demand the issuance and service of a warrant of extradition and to apply for a Writ of Habeas Corpus against detention, do hereby, as part of my conditions of release, waive the issuance and service of all extradition proceedings for a warrant arising from this case. I freely and voluntarily agree to return to the state of Minnesota from any jurisdiction in or outside of the United States, accompanied by a peace officer thereof, for the purpose of answering this criminal charge pending against me.

C. J. Castro
Christian J. Castro

Subscribed to in my presence
this 17th day of September, 20 26.

P. R. Scoggin
Judge of District Court
Hennepin County, Minnesota
PAUL R SCOGGIN

**EXHIBIT F**

6

# Hennepin County Sheriff's Office

**Adult Detention Center**

**Filed In District Court**
**State of Minnesota**

SEP 1 8 2026

## RELEASE RECEIPT | NOTICE OF APPEARANCE

Name (L,F,M): CASTRO, CHRISTIAN JEREMIAH DOB: 12/26/1973 Booking #: 2026020087

Name Provided: CASTRO, CHRISTIAN

Inmate File #: 202604990 SILS ID: 974462 Race: ASIAN OR PACIFIC ISLANDER

Inmate Email: Arrest Date: 09/16/2026 Sex: MALE

Inmate Address: 4400 ENSENADA AVE
MCALLEN, TX 78504
Cell Phone: (808) 209-5414

**COURT APPEARANCE** 2026020087.1 **Apply this case** YES ◉ NO ○

☐ COURT NOT REQUIRED
☐ HEARING NOTICE WILL BE MAILED TO ADDRESS PROVIDED AT BOOKING
☑ COURT REQUIRED AS INDICATED BELOW:

| MNCIS CASE # | OFFENSE DESCRIPTION |
|---|---|
| 27CR2612537 | F 609.222.1 ASSAULT-2ND DEGREE-DANGEROUS WEAPON ; F 609.222.1 ASSAULT-2ND DEGREE-DANGEROUS WEAPON ; F 609.222.1 ASSAULT-2ND DEGREE-DANGEROUS WEAPON ; F 609.222.1 ASSAULT-2ND DEGREE-DANGEROUS WEAPON ; M 609.505.1 FALSELY REPORTING CRIME TAB |

| CHARGING AGENCY | COMMUNITY OF OFFENSE | CHARGING CCN |
|---|---|---|
| MN BUREAU OF CRIMINAL APPREHENSION | MINNEAPOLIS | 26000126 |

| PAYMENT TYPE | BOND CO. | AMT POSTED |
|---|---|---|
| BOND | Midwest Bonding, LLC | $ 200000.00 |

| COURT LOCATION | GOVERNMENT CENTER/CRIMINAL/CIVIL BLOCK | COURT DATE/TIME | 11/03/2026 13:00 |
|---|---|---|---|

NOTE: By placing my signature below, I hereby acknowledge that I have been advised by Jailor, of my rights to be brought before a Magistrate promptly for the above charge(s); That I have waived any delay in that right and agreed to pay a fine, if eligible, or to appear as scheduled above; That if I fail to appear as scheduled, a Bench Warrant will be issued for my case and any bail or bond posted or future consideration for release on my own recognizance will be forfeited. I have received a copy of this form as my Release Receipt.

Inmate Signature C.J. Castro Signature Date/Time: mm/dd/yyyy --:-- --

Employee User ID: BENNETT AUBE001 Date/Time: 09/17/2026 16:57

Hennepin County Public Safety Facility
401 South 4th Street
Minneapolis, MN 55415

Hennepin County Gov't Center
300 South 6th Street
Minneapolis, MN 55487

Hennepin County Juvenile Center
590 Park Avenue
Minneapolis, MN 55415

Hennepin County Family Court
110 South 4th Street
Minneapolis, MN 55401

Hennepin County Brookdale
6125 Shingle Creek Parkway
Brooklyn Center 55430

Hennepin County Ridgedale
12601 Ridgedale Drive
Minnetonka, MN 55305

**EXHIBIT G**

Filed in District Court
State of Minnesota
9/21/2026 8:17 AM

HENNEPIN COUNTY
FOURTH JUDICIAL DISTRICT

COMMUNITY CORRECTIONS & REHABILITATION
ADULT FIELD DIVISIONS

# Criminal Record Summary

**Defendant's Name:** Christian Jeremiah Castro | **Date of Birth:** 12/26/1973

**SILS #:** 974462 | **CA File #:** 26A05307 | **MNCIS Case #:** 27-CR-26-12537

**Date Prepared:** 09/18/2026 | **Date Distributed:** 11/03/2026 | **PO:** Julie Erickson, (612) 348-3662

*The information contained herein is based on the resources available at this time and done without interviewing the defendant. It may not identify all convictions or issues of Probation/Parole supervision. This summary cannot be viewed as an accurate, thorough, or complete investigation of the defendant's prior record. The convictions shown are only those needed to complete the summary and only those convictions allowed to be used per the Minnesota Sentencing Guidelines. Additional convictions may be left off due to decay or not being guidelines applicable.*

***NOTE: This Record Summary will NOT be updated**. Any reference made to unknown or outstanding cases (in-state or out-of-state) is for probation records only and will be added only after a finding of guilt and/or at time of sentencing. Regarding out-of-state convictions, it is the position of the Guidelines Commission that final determination of equivalent MN offenses and weights must be made by the Court prior to sentencing. When possible, an approximation of equivalent MN offense and weight is offered on the Criminal Record Summary; however, should the Court make an alternate determination, the presumptive sentence is subject to change.*

***The criminal history on page 2 is based upon the applicable Minnesota Sentencing Guidelines in the year for which the offense occurred. Per the interim Court guidance regarding the amelioration doctrine, the applicable year's guidelines presumptive is provided at the bottom of page 2. The guidelines presumptive for the 2026 guidelines are also provided as a courtesy to the Court and parties, should that be applied.***

**Additional Information:**



Hennepin

Filed in District Court
State of Minnesota
9/21/2026 8:17 AM

# CRIMINAL RECORD SUMMARY – CASE #27-CR-26-12537

| Client Name (First, Middle, Last) | DOB | Race | Sex | SILS # | Minnesota State ID |
|---|---|---|---|---|---|
| Christian Jeremiah Castro | 12/26/1973 | Asian/ Pacific.Islander | Male | 974462 | MN26GM6200 |

**Offense(s)**
CT 1: Assault-2nd Degree-Dangerous Weapon; CT 2: Assault-2nd Degree-Dangerous Weapon; CT 3: Assault-2nd Degree-Dangerous Weapon; CT 4: Assault-2nd Degree-Dangerous Weapon; CT 5: Falsely Reporting Crime

**Date of Offense**
01/14/2026

**Minnesota Statute**
609.222.1, 609.11.5(a)

**Severity Level**
6

**Additional Pending Cases (Guidelines-applicable only)**
Fraud False Statements (Federal)

**Felony, Gross Misd or Targeted Misd custody supervision at time of offense?** ☐ Yes ☒ No
**Type:** ☐ Probation ☐ Parole/SR/CR ☐ Released Pending Sentencing ☐ Confined ☐ Escape ☐ EJJ ☐ Other

**Custody Point(s)**
0

## CRIMINAL HISTORY

| Juvenile | | Off Date | Dispo Date |
|---|---|---|---|
| 1 | | | |
| 2 | | | |

**Juvenile Points**
0
☐ Juvenile history exists but is either decayed or does not apply

| Misdemeanor/Gross Misdemeanor | | Units | Dispo Date |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |

**M/GM Points**
0
☐ Offense(s) used to enhance to Felony level
☒ Decayed M/GM conviction(s)
☐ Offense(s) not used

| Felony/EJJ | | SL/Weight | Dispo Date |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |

**Felony/EJJ Points**
0
☐ Decayed Felony conviction(s)

**Total Criminal History Points**
0

**Guidelines Presumptive Sentence in Effect When the Offense Occurred (Pre 8/1/26)**

☐ Stay ☒ Commit to Commissioner **36 months**

☐ 3 months added ☐ SVO ____ months added ☐ 0.5 custody point not used to determine presumptive sentence

**Guidelines Presumptive Sentence Applying the Post 8/1/26 Modifications**

☐ Stay ☒ Commit to Commissioner **36 months**

☐ SVO ____ months added ☐ Custody Status __0__ months added

**Severity Level** 6 **Total Criminal History Points** 0

# EXHIBIT H

27-CR-26-12537

Filed in District Court
State of Minnesota
9/29/2026 3:20 PM

**State of Minnesota**
County of Hennepin

**District Court**

| | |
|---|---|
| Judicial District: | 4 |
| Court File Number: | 27-CR-26-12537 |
| Case Type: | Criminal |

The State of Minnesota,
Plaintiff

Vs.

Christian J. Castro,
Defendant

ORDER REGARDING
PRO HAC VICE

**THE COURT FINDS:**

1. A Motion for Admission of Pro Hac Vice was filed by: Daniel L. Gerdts, an attorney admitted to practice in Minnesota.
2. The proposed admittee, Michael J. Wynne, is an attorney admitted to practice in the trial courts of Texas, but not admitted to the bar of this court. The attorney will be counsel for the ☐ Plaintiff/Petitioner ☒ Defendant/Respondent.
3. The following documents have been submitted:
   - ☒ Copy of Application submitted under Rule 5.03 to the Minnesota Board of Law Examiners;
   - ☒ Copy of the Notice from the Board of Law Examiners confirming good standing.
4. Other: ______

**IT IS ORDERED:**

1. The Court ☒**Grants** ☐**Denies** the motion for Pro Hac Vice in the above entitled matter.

BY THE COURT:

Dated: 9/29/26

Judge of District Court

**Note:** This order must be filed with the Court Administrator before you will receive notices generated in this action.

**Exhibit I**

27-CR-26-12537

Filed in District Court
State of Minnesota
10/15/2026 9:24 AM

| **State of Minnesota** | **District Court** |
|---|---|
| County of Hennepin | |

| | |
|---|---|
| Judicial District: | 4 |
| Court File Number: | 27-CR-26-12537 |
| Case Type: | Criminal |

The State of Minnesota,
Plaintiff

Vs.

Christian J. Castro,
Defendant

# ORDER REGARDING PRO HAC VICE

## THE COURT FINDS:

1. A Motion for Admission of Pro Hac Vice was filed by: Daniel L. Gerdts, an attorney admitted to practice in Minnesota.
2. The proposed admittee, Jon Muschenheim, is an attorney admitted to practice in the trial courts of Texas, but not admitted to the bar of this court. The attorney will be counsel for the ☐ Plaintiff/Petitioner ☒ Defendant/Respondent.
3. The following documents have been submitted:
   - ☒ Copy of Application submitted under Rule 5.03 to the Minnesota Board of Law Examiners;
   - ☒ Copy of the Notice from the Board of Law Examiners confirming good standing.
4. Other:

______________________________

## IT IS ORDERED:

1. The Court ☒**Grants** ☐**Denies** the motion for Pro Hac Vice in the above entitled matter.

BY THE COURT:

Dated: 10/14/26

Paul R. Scoggin
Judge of District Court

**Note:** This order must be filed with the Court Administrator before you will receive notices generated in this action.

# EXHIBIT J

MINNESOTA
JUDICIAL BRANCH
MINNESOTA COURT RECORDS ONLINE (MCRO)

## Case Details (Register of Actions)

Search executed on 10/16/2026 11:08 AM

**Upcoming Hearing:**
Omnibus Hearing on **11/03/2026** at **1:00 PM**

### Case Information

**Case Number:** 27-CR-26-12537
**Case Title:** State of Minnesota vs Christian J. Castro
**Case Type:** Crim/Traf Mandatory
**Date Filed:** **05/18/2026**
**Case Location:** Hennepin County, Hennepin Criminal Downtown
**Judicial Officer:** Scoggin, Paul
**Case Status:** Open

### Party Information

#### Jurisdiction
State of Minnesota

#### Attorneys Active
- LARSON, JOSHUA RYAN - Lead Attorney

- DOERFLER, TAYLOR LEIGH

**Defendant**

**Castro, Christian J.**
DOB: 12/26/1973
McAllen, TX 78504

**Attorneys Active**

- **GERDTS, DANIEL L - Lead Attorney**

## Warrants

**Inactive Warrants**

Castro, Christian J. Arrest, Complaint, Order of Detention
Judicial Officer: Scoggin, Paul
09/16/2026 03:51 PM Status: Warrant Cleared by Wt Office
05/18/2026 12:37 PM Status: Issued Active

Bond/Bail Options
Bond or Cash Bail Amount: $200,000.00

## Charges

1 Assault-2nd Degree-Dangerous Weapon **Statute:** 609.222.1

**Additional Statutes:** Minimum Sentences of Imprisonment-Firearm Use or Possession (609.11.5(a)); Assault-2nd Degree-Dangerous Weapon (609.222.1)

**Level of Charge:** Felony

**Offense Date:** 01/14/2026

**Community Of Offense:** Minneapolis

**Law Enforcement Agency:** MN Department of Public Safety - BCA

**Prosecuting Agency:** Hennepin County Attorney

2 Assault-2nd Degree-Dangerous Weapon **Statute:** 609.222.1

**Additional Statutes:** Minimum Sentences of Imprisonment-Firearm Use or Possession (609.11.5(a)); Assault-2nd Degree-Dangerous Weapon (609.222.1)

**Level of Charge:** Felony

**Offense Date:** 01/14/2026

**Community Of Offense:** Minneapolis

**Law Enforcement Agency:** MN Department of Public Safety - BCA

**Prosecuting Agency:** Hennepin County Attorney

3 Assault-2nd Degree-Dangerous Weapon **Statute:** 609.222.1

**Additional Statutes:** Minimum Sentences of Imprisonment-Firearm Use or Possession (609.11.5(a)); Assault-2nd Degree-Dangerous Weapon (609.222.1)

**Level of Charge:** Felony

**Offense Date:** 01/14/2026

**Community Of Offense:** Minneapolis

**Law Enforcement Agency:** MN Department of Public Safety - BCA

**Prosecuting Agency:** Hennepin County Attorney

4 Assault-2nd Degree-Dangerous Weapon **Statute:** 609.222.1

**Additional Statutes:** Minimum Sentences of Imprisonment-Firearm Use or Possession (609.11.5(a)); Assault-2nd Degree-Dangerous Weapon (609.222.1)

**Level of Charge:** Felony

**Offense Date:** 01/14/2026

**Community Of Offense:** Minneapolis

**Law Enforcement Agency:** MN Department of Public Safety - BCA

**Prosecuting Agency:** Hennepin County Attorney

5 Falsely Reporting Crime **Statute:** 609.505.1

**Additional Statute:** Falsely Reporting Crime (609.505.1)

**Level of Charge:** Misdemeanor

**Offense Date:** 01/14/2026

**Community Of Offense:** Minneapolis

**Law Enforcement Agency:** MN Department of Public Safety - BCA

**Prosecuting Agency:** Hennepin County Attorney

## Interim Conditions

**09/17/2026**

**Interim conditions for Castro, Christian J.**
Judicial Officer: Scoggin, Paul

- Post Bail or Bond with No Conditions
  $400,000.00

- Post Bail or Bond with Conditions
  $200,000.00
- Remain law-abiding
- Make all future court appearances
- No contact with witness(es)
- Do not ship/transport/possess or receive firearm or ammo
- Conditions, other
- Contact with probation
- Follow all instructions of probation
- Sign all releases of information
- Electronic monitoring

## Case Events

| | | |
|---|---|---|
| **10/15/2026** | Order-Other<br>Judicial Officer: Scoggin, Paul<br>Index #21 | *1 page* |
| **10/14/2026** | Other Document<br>Index #20 | *1 page* |
| **10/14/2026** | Other Document<br>Index #19 | *2 pages* |
| **10/14/2026** | Affidavit-Other | |

| | | |
|---|---|---|
| | Index #18 | 2 pages |
| 10/14/2026 | Motion for Admission Pro Hac Vice<br>Index #17 | 1 page |
| 09/29/2026 | Order Granting Pro Hac Vice<br>Index #16 | 1 page |
| 09/28/2026 | Proposed Order or Document<br>Index #15 | 1 page |
| 09/28/2026 | Other Document<br>Index #14 | 1 page |
| 09/28/2026 | Other Document<br>Index #13 | 3 pages |
| 09/28/2026 | Affidavit of Attorney<br>Index #12 | 2 pages |
| 09/28/2026 | Motion for Admission Pro Hac Vice<br>Index #11 | 1 page |

| | | |
|---|---|---|
| **09/21/2026** | Hearing Held Remote | |
| **09/21/2026** | Pre-Plea Worksheet<br>Index #10 | |
| **09/18/2026** | Law Enforcement Notice of Release and Appearance<br>Index #8 | *1 page* |
| **09/17/2026** | Waiver of Extradition<br>Judicial Officer: Scoggin, Paul<br>Index #7 | *1 page* |
| **09/17/2026** | Order for Conditional Release<br>Judicial Officer: Allyn, Julie<br>Index #6 | *1 page* |
| **09/17/2026** | Identity Verified | |
| **09/17/2026** | Statement of Rights<br>Index #5 | |
| **09/17/2026** | Hearing Held In-Person | |
| **09/17/2026** | Pretrial Release Evaluation Form<br>Index #4 | |

| | | |
|---|---|---|
| **09/16/2026** | Non-Cash Bond Posted<br>Index #9 | *2 pages* |
| **09/16/2026** | Warrant Cleared by Wt Office | |
| **09/15/2026** | Certificate of Representation<br>Index #3 | *1 page* |
| **05/18/2026** | Warrant Issued<br>Index #2 | |
| **05/18/2026** | E-filed Comp-Warrant<br>Index #1 | *11 pages* |

## Hearings

### Upcoming Hearings

**11/03/2026** **01:00 PM**
Omnibus Hearing
Judicial Officer: Scoggin, Paul
Location: GC-C1756

### Previous Hearings

**09/21/2026** **03:30 PM**
Hearing
Judicial Officer: Scoggin, Paul
**Result:** Held Off the Record

Location: Zoom

| | | | |
|---|---|---|---|
| **09/17/2026** | **01:30 PM** | First Appearance<br>Judicial Officer: Allyn, Julie<br>Location: PSF 141 | **Result:** Held On the Record |

## Bond/Bail Activity

### Appearance Bond

Castro, Christian J.

| | |
|---|---|
| 09/16/2026 | Status: Posted<br>$200,000.00 |

Search executed on 10/16/2026 11:08 AM

**EXHIBIT K**

United States District Court
Southern District of Texas
**ENTERED**
August 26, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| TIM WALZ, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:26-CV-906 |
| | § | |
| GREG ABBOTT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## **ORDER**

In January 2026, Christian Castro, in the course of his duties as an agent for United States Immigration and Customs Enforcement, discharged his firearm through the closed door of a home into which an individual he had been pursuing had entered. Castro's shot injured one person in the leg.

In May, the State of Minnesota charged Castro with various crimes based on that incident. By the time these charges arose, however, Castro was no longer in Minnesota, leading a county judge to issue a nationwide warrant for his arrest. When authorities in the State of Texas arrested Castro in late May, Minnesota Governor Tim Waltz initiated the process under the Extradition Act of 1793 and the Uniform Criminal Extradition Act to secure Castro's extradition to Minnesota.

Under the UCEA, Castro can be detained on the strength of the Minnesota warrant only until August 27, 2026. As the day approached, and fearing that Castro will flee into Mexico should he be released, Minnesota made repeated inquiries of Texas regarding the status of the extradition request. On August 18, having not received a definitive answer, Minnesota filed this action, alleging that Governor Abbott "has refused" to sign a rendition warrant, violating the Extradition Clause of the United States Constitution, the Extradition Act, and the UCEA.

Minnesota moves for a temporary restraining order to avoid Castro's release before Governor Abbott signs a rendition warrant. On August 25, the Court held a hearing on the request.

Based on the record and the applicable law, the Court concludes that Minnesota fails to satisfy the requirements for the issuance of a temporary restraining order.

## I. Factual Background and Procedural History

On January 14, 2026, ICE agent Castro took part in an enforcement effort in Minnesota that ended with Castro firing a single shot from his firearm through the front door of a home, injuring one individual. Based on this incident, on May 18, 2026, authorities in Hennepin County, Minnesota charged Castro with four felony counts of second degree assault and one misdemeanor count of falsely reporting a crime. The same day, a Hennepin County Judge issued a nationwide warrant for Castro's arrest.

On May 29, authorities in Cameron County, Texas arrested Castro on the strength of the Minnesota warrant and booked him into the Cameron County Jail. The Booking Report reflects that Castro was "pending extradition[.]" (Booking Report, Doc. 8–3, 9)

On June 2, Governor Walz formally requested Castro's extradition by sending a package of documentation to Governor Abbott, in accordance with the Extradition Act and the UCEA. The documents included certified copies of the charging instruments and evidence to support the charges, as well as identifying information as to Castro.

On June 4, Castro appeared before a Cameron County Judge, who informed Castro of the extradition request and initially denied bond, although later the judge granted Castro the ability to post a $200,000 bond to secure his release. Castro has neither posted bond nor waived his rights regarding extradition. He remains in custody in Cameron County.

Starting in early June, Minnesota repeatedly inquired with Texas officials regarding the status of Castro's extradition. Over the past year, Minnesota has presented multiple extradition

requests to the State of Texas. In most instances, Texas Governor Greg Abbott has signed the rendition warrant within weeks of receiving the request.

On July 30, Hennepin County Attorney Mary Moriarty sent a letter to Governor Abbott urging him to issue the rendition warrant and noting that over two months had elapsed since Castro's arrest. The next day, Governor Abbott requested that the Texas Secretary of State "investigate [the extradition] demand and report to me concerning Mr. Castro's situation and circumstances and whether he ought to be surrendered." (Letter from Greg Abbott, Governor of Texas, to Robert Howden, Secretary of State (July 31, 2026), *available at* Legislative Reference Library of Texas, https://tinyurl.com/mannweac) In particular, Governor Abbott expressed "serious doubts that the prerequisites for extradition have been met" because of "information indicating that Mr. Castro was compelled to return to Texas on orders of the federal government." *Id.*[1] The record contains no information indicating that Minnesota was aware of Governor Abbott's request for an investigation by the Secretary of State. When Minnesota officials followed up on the matter, Texas representatives responded that the matter remained pending.

On August 18, the State of Minnesota, acting on behalf of Governor Tim Walz and Attorney General Keith Ellison, filed its Complaint and accompanying motion for a temporary restraining order. Minnesota argues that absent injunctive relief, Castro "may be eligible for release from custody as soon as August 26, 2026[,]" and that following such release, Castro may flee to Mexico, where "it may take months or even many years for the extradition request to be heard by the [Mexican] courts and for the executive authority [in Mexico] to make a surrender decision." (Mem. in Support, Doc. 8–1, 3, 16)

In support of its position that Castro represents a flight risk, Minnesota submits evidence that while incarcerated, Castro has held regular and repeated phone calls with a woman who lives in Progreso, Mexico. (Minvielle Decl., Doc. 22–2, ¶ 5 ("[M]any of his calls are with a woman . . .

[1] The Department of Justice has confirmed that on January 15, 2026, ICE leadership ordered Castro to return to Texas. (Statement of United States, Doc. 21, 2)

who is his romantic partner.")) In those calls, Castro has expressed a desire to purchase property in Mexico and move there in the future. Castro did not disclose this relationship or prior trips to Mexico on a federal employment form which requires the disclosure of such information.

On August 25, the Court held a hearing on the motion for temporary restraining order. At the hearing, counsel for Sheriff Manuel Trevino represented that absent a court order or the issuance of a rendition warrant by Governor Abbott, Castro would be released on August 27.

## II. Analysis

Minnesota asks the Court to issue a temporary restraining order "compel[ling] Defendant Texas Governor Greg Abbott to execute a rendition warrant for Christian Castro's extradition forthwith, and [ ] enjoin[ing] Defendant Cameron County Sheriff Manuel Trevino . . . from releasing Christian Castro from custody until Defendant Texas Governor Greg Abbott has executed a rendition warrant and Castro is transferred to Plaintiff's agents for extradition." (Motion, Doc. 8, 3)

Federal Rule of Procedure 65 governs the issuance of temporary restraining orders. A party seeking such relief must establish four elements:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006) (quoting *Concerned Women for Am., Inc. v. Lafayette Cty.*, 883 F.2d 32, 34 (5th Cir. 1989)). "The third and fourth factors—balance of harm and public interest—merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 287 (5th Cir. 2024). Emergency injunctive relief represents an extraordinary remedy, *see Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987), and the moving party must "clearly carr[y] the burden of persuasion on all four requirements." *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

### A. Substantial Likelihood of Success on the Merits

"A plaintiff is not required to prove its entitlement to summary judgment in order to establish 'a substantial likelihood of success on the merits' for preliminary injunction purposes." *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (quoting *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 596 n. 34 (5th Cir. 2003)).[2] "Though there is no particular degree of likelihood of success that is required in every case, the party seeking a preliminary injunction must establish at least some likelihood of success on the merits[.]" *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017); *see also Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quoting Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995)) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.").

A successful jurisdictional challenge by a defendant defeats the request for a temporary restraining order. *See, e.g., Tex. Med. Ass'n v. Sullivan*, 875 F.2d 1160, 1170 (5th Cir. 1989). (reversing the granting of a preliminary injunction because the district court lacked subject matter jurisdiction).

#### 1. The Interstate Extradition Process

Here, Minnesota alleges three causes of action, based respectively on the Extradition Clause of the United States Constitution (U.S. CONST., art. IV, § 2, cl. 2), the Extradition Act of 1793 (18 U.S.C. § 3182), and the Uniform Criminal Extradition Act ("UCEA") (codified at Texas Code Criminal Procedure, article 51.13). These authorities create a procedure for the interstate extradition of individuals charged with criminal conduct, but who are fugitives from the state in which they stand accused.

[2] As a general matter, the requirements for a temporary restraining order mirror those applicable to the issuance of a preliminary injunction. *See, e.g.*, 11A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2951 (3d ed.) ("With the emphasis that the temporary restraining order is intended to prevent immediate irreparable harm, courts ordinarily apply the same four-part standard used in the preliminary injunction context.").

The Extradition Clause of the United States Constitution establishes this right, providing that a "person charge in any state with [a] felony, . . . who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime." U.S. CONST. art. IV § 2 cl. 2. The Extradition Clause represents a "limit[ ] on the sovereign powers of the States[.]" *California v. Superior Court of California, San Bernardino Cnty.*, 482 U.S. 400, 405 (1987). "The obvious objective of the Extradition Clause is that no State should become a safe haven for the fugitives from a sister State's criminal justice system." *Id.* at 406. "Its mandatory language furthers its intended purpose: 'to enable each state to bring offenders to trial as swiftly as possible in the state where the alleged offense was committed,' and 'to preclude any state from becoming a sanctuary for fugitives from justice of another state.'" *Puerto Rico v. Branstad*, 483 U.S. 219, 227 (1987) (quoting *Michigan v. Doran,* 439 U.S. 282, 286 (1978)). Under this constitutional provision neither "executive officers [nor] courts of the asylum State" possess discretion to deny a proper extradition request. *Branstad*, 483 U.S. at 227. Indeed, federal courts are vested with the power to direct state officials to comply with the Extradition Clause. *Id.* at 222–30.

The Extradition Clause, however, is not self-executing and "does not specifically establish a procedure by which interstate extradition is to take place[.]" *California*, 482 U.S. at 406. As a result, Congress passed the Extradition Act of 1793, 18 U.S.C. § 3182. Under the statute's prescribed process, the governor of a state may "demand[ ] any person as a fugitive from justice, of the [governor] of any State . . . to which such person has fled[.]"[3] 18 U.S.C. § 3182. To make such a request, the governor of the demanding state must provide the governor of the asylum state a certified copy of the indictment or affidavit "charging the person demanded with having committed" a felony. *Id.* The governor of the asylum state "shall cause [the accused individual] to be arrested and secured, and [shall] notify the [governor] making such demand, or the agent of

[3] The statute references the "executive authority" of the states involved. With respect to Texas and Minnesota, Governor Abbott and Governor Waltz represent the executive authority of his respective state.

such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear." *Id.*

Congress intended interstate extradition under these authorities "to be a summary procedure." *California*, 482 U.S. at 407. When a governor in an asylum state receives an extradition request, the Extradition Act "leaves only four issues open for consideration before the fugitive is delivered up:"

> (a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive.

*Id.* at 408 (citing *Doran*, 439 U.S. 282, 289)).

In conjunction with the Extradition Clause and Extradition Act, many states, including Texas and Minnesota, have adopted the Uniform Criminal Extradition Act ("UCEA"). *See, e.g.,* TEX. CODE CRIM. P. art. 51.13. The statute provides additional procedural mechanisms to facilitate the interstate extradition of fugitives, and includes protections for accused individuals. For example, the UCEA forbids a governor from recognizing an extradition request unless the demanding state makes certain allegations in writing, including "that the accused was present in the demanding State at the time of the commission of the alleged crime, and that thereafter he fled from the State[.]" *Id.* at § 3. The demanding state must also include a copy of the charging document, and the charging document "must substantially charge the person demanded with having committed a crime under the law of that State[.]" *Id.* The statute also authorizes the governor of the asylum state to "call upon the Secretary of State, Attorney General or any prosecuting officer in [the state] to investigate or assist in investigating the demand, and to report to him the situation and circumstances of the person so demanded, and whether he ought to be surrendered. *Id.* at § 4. Ultimately, "[i]f the Governor decides that the demand should be complied with, he shall sign a warrant of arrest [the "rendition warrant"], which shall be sealed with the state seal and be directed to any peace officer or other person whom he may think fit to entrust

with the execution thereof. The warrant must substantially recite the facts necessary to the validity of its issuance." *Id.* at § 7.

The UCEA also limits the time period during which an individual may be detained based on an extradition warrant from the demanding state. "A fugitive not arrested under a warrant from the Governor of this State before the expiration of ninety days from the day of his commitment or the date of the bail shall be discharged." TEX. CODE CRIM. P. art. 51.07. In addition, the parties agree that an arrested fugitive may be afforded the opportunity to post bond during this 90-day period.

**2. Subject Matter Jurisdiction**

In addition to contesting that Minnesota can prevail on the merits of any of its claims, Texas presents various threshold arguments challenging the jurisdiction of the Court to consider this lawsuit. As an initial argument, Texas contends that the Court lacks subject matter jurisdiction because "Governor Abbott has not refused [Minnesota's] extradition demand[,]" and no statute imposes a "set period of time" in which Governor Abbott must sign the rendition warrant. (Texas Resp., Doc. 20, 15, 17) In short, Texas claims that Minnesota's lawsuit is not ripe.

The doctrine of ripeness concerns "whether a dispute has yet matured to a point that warrants decision." 13A Wright & Miller, § 3532. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up) (quoting *Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568, 580–581). Courts consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967); *see also Placid Oil Co. v. Federal Energy Regul. Comm'n*, 666 F.2d 976, 981 (5th Cir. 1982). Typically, a case is ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required. *Thomas*, 473 U.S. at 581.

Based on the current record, the Court concludes that it lacks subject matter jurisdiction because the case is not ripe for adjudication.

Minnesota's lawsuit necessarily rests on the argument that Governor Abbott has violated the Extradition Clause, the Extradition Act, or the UCEA by having failed to sign a rendition warrant by now. Minnesota cannot premise its causes of action on the allegation that Governor Abbott *may* violate those authorities in the future; it must prove that a violation has already occurred. Otherwise, Minnesota would be impermissibly seeking relief based solely on a premature or speculative allegation about possible future events—i.e., that Governor Abbott will wrongfully deny the request for extradition.

The record before the Court, however, reveals that Governor Abbott has not denied the request for a rendition warrant. Minnesota alleges that Governor Abbott has "refused to sign" and has "with[eld]" the rendition warrant. But the record reflects only that Governor Abbott has neither agreed nor refused to sign the rendition warrant as to Castro. Instead, Governor Abbott has requested that the Texas Secretary of State "investigate [Minnesota's] demand and report to [the Governor] concerning Mr. Castro's situation and circumstances and whether he ought to be surrendered." (Letter from Greg Abbott, Governor of Texas, to Robert Howden, Secretary of State (July 31, 2026), *available at* Legislative Reference Library of Texas, https://tinyurl.com/mannweac). The UCEA expressly authorizes Governor Abbott to take this step, *see* TEX. CODE CRIM. P. art. 51.13 § 4, and the Secretary of State has not yet reported back regarding the investigation. As a result, Governor Abbott has not determined whether to sign the rendition warrant.

Minnesota's position would succeed only if the Extradition Clause, Extradition Act, or UCEA required Texas to act on the request for a rendition warrant within a specified time period that has already elapsed. Under those circumstances, Governor Abbott's failure to act within the time period would amount to a violation of the constitutional and statutory authorities and would

present an issue ripe for adjudication. But on this point, neither the Extradition Clause nor either statute at issue contains such a requirement. Minnesota's argument effectively asks the Court to impose into the Extradition Clause, the Extradition Act, and the UCEA a deadline for a state governor to sign a rendition warrant or decline to do so. The Court is unaware of any authority supporting the creation of a court-imposed deadline under these circumstances.

Minnesota contends that Texas has uncharacteristically and unnecessarily delayed consideration of the issue, presenting evidence that in most cases, Governor Abbott has signed rendition warrants within a few weeks of Minnesota's request. In contrast, as to Castro, Governor Abbott waited almost two months after receiving Minnesota's extradition demand before requesting an investigation by the Texas Secretary of State, doing so only after Hennepin County Attorney Moriarty submitted an additional formal request to complete the extradition. And on the eve of Castro being released under Texas law, Governor Abbott contends that he requires more time to vet whether Castro is a fugitive. No party disputes this chronology of events, and the Court accepts that Governor Abbott has considered this particular extradition request for an atypically-long duration. Nevertheless, Minnesota identifies no statutory or constitutional provision requiring Governor Abbott to complete his investigation and decide whether to sign the rendition warrant within a particular time period.

In addition, ample caselaw supports Governor Abbott's decision to investigate whether Castro is a fugitive for purposes of the Extradition Clause and the statutes. More than one hundred years ago, the Supreme Court explained that when a governor receives a request for the extradition of an accused individual, "[c]ertain facts . . . must appear before the governor has the right to issue his warrant." *Hyatt v. People of State of New York*, 188 U.S. 691, 709 (1903). In particular, the governor must ensure "that the person demanded is substantially charged with a crime against the laws of the state from whose justice he is alleged to have fled, by an indictment or an affidavit, etc., and that the person demanded is a fugitive from the justice" of the demanding

state. *Id.* In the present case, Governor Abbott expressly requested that the Secretary of State investigate whether Castro is a fugitive, a determination that *Hyatt* and other authorities expressly dictate that a governor not only may, but must consider.[4]

Minnesota raises the concern that Texas's construction of the Extradition Clause and the related statutes permits an asylum state to thwart the purpose of these authorities by investigating a demand for extradition indefinitely. On this point, the Court does not reach whether circumstances could arise when an asylum state's prolonged delay in the investigation of an extradition demand would constitute the constructive denial of the demand, so as to create an issue ripe for adjudication. The record in the present matter does not present such circumstances. Governor Abbott requested an investigation by the Texas Secretary of State about 60 days after receiving Minnesota's extradition demand. The record contains no direct evidence indicating that Governor Abbott made this request for the purpose of delay, or that the investigation will continue for a prolonged period. The threat of an indefinite consideration of Minnesota's extradition request does not currently exist.

Minnesota also argues that Sheriff Trevino will release Castro on August 27, 2026, and that upon his release, Castro may flee the country, which would significantly hinder Minnesota's efforts to prosecute its case against him. The Court agrees that Castro's flight to Mexico would

---

[4] The Court has doubts that caselaw supports the construction of "fugitive" that Texas is considering. According to Texas, it is investigating whether, in the context of interstate extradition, a fugitive is a person who volitionally leaves the state in which he is charged. Here, Texas proposes, Castro did not leave Minnesota volitionally, but did so in response to a directive from ICE, his employer. But as the Supreme Court long ago explained, a fugitive is a person who, "having within a state committed that which by its laws constitutes a crime, when he is sought to be subjected to its criminal process to answer for his offense, he has left its jurisdiction, and is found within the territory of another." *Roberts v. Reilly*, 116 U.S. 80, 97 (1885). Under this rubric, the focus rests not on the accused's reason for leaving the state, but simply on whether he in fact left. Consistent with this broad construction of "fugitive," cases that have concluded that an individual was not a fugitive all involved persons who were not within the state demanding extradition when the alleged offense occurred. *See, e.g.*, *Hyatt v. New York*, 188 U.S. 691 (1903); *Fowler v. Ross*, 196 F.2d 25, 35 (D.C. Cir. 1952); *Moncrief v. Anderson*, 342 F.2d 902 (D.C. Cir. 1964). And in one case, a circuit court concluded that a prisoner transferred by state custodial authorities from Kansas to Wyoming became a fugitive from Kansas for purposes of extradition. *Gee v. Kansas*, 912 F.2d 414, 419 (10th Cir. 1990) ("Once petitioner *was moved* outside Wyoming State boundaries, he became a fugitive from justice within the meaning of 18 U.S.C. § 3182.") (emphasis added). The transferred individual in *Gee* made no more of a volitional act to leave Kansas than Castro did to leave Minnesota. But the Tenth Circuit still concluded that the accused was a fugitive for purposes of interstate extradition.

impose a hardship on Minnesota's prosecutorial efforts. But that possible outcome does not alter the analysis. At most, the impending release and potential flight by Castro supports Minnesota's showing of irreparable injury, for purposes of the second prong of the Rule 65 analysis. But the threat of irreparable injury does not obviate the need for Minnesota to demonstrate that it has a substantial likelihood of success on the merits of at least one of its causes of action. And the threat of injury by itself does not create an issue ripe for adjudication.

Effectively, Minnesota requests that the Court impose the 90-day detention limit within Articles 51.05 and 51.07 of the Texas Code of Criminal Procedure as the outer limit for Texas's consideration of Minnesota's extradition request. If Texas fails to act within those 90 days, Minnesota contends, a federal district court should step into Texas's shoes, review the extradition request, and order the governor of the state to sign the rendition warrant. But as previously explained, the Court finds no authority supporting the creation of a deadline for a governor's permissible investigation under the Extradition Clause and Extradition Act.[5]

For these reasons, the Court concludes that this matter does not present an issue ripe for adjudication. As a result, Minnesota fails to demonstrate a substantial likelihood of success on the merits of any of its causes of action. And this failure defeats its request for a temporary restraining order.[6]

**B. Remaining Factors**

The Court's conclusion as to subject matter jurisdiction renders it unnecessary to reach the parties' other arguments or to consider the remaining prongs of the Rule 65 analysis.

---

[5] Alternatively, Minnesota requests that the Court order Sheriff Trevino to not release Castro until Governor Abbott has signed a rendition warrant. For the reasons stated on the record at the August 25 hearing, the Court concludes that no grounds support a temporary restraining order requiring Sheriff Trevino to ignore the dictates of Texas Code of Criminal Procedure Articles 51.05 and 51.07. No party challenges the validity of those statutory provisions, and Minnesota does not allege that Sheriff Trevino has acted wrongfully to date in connection with Castro's detention or would act wrongfully by releasing Castro based on those statutes.

[6] Even if this case presented an issue ripe for adjudication, the same analysis would lead the Court to conclude that Minnesota fails to demonstrate a substantial likelihood of success on the merits. Governor Abbott has not violated the Extradition Act, Extradition Clause, or the UCEA by considering Minnesota's extradition request for three months. Those statutes prescribe no deadline for a governor of the asylum state to complete an investigation and either sign a rendition warrant or deny the request.

## III. Conclusion

For these reasons, the Court concludes that Minnesota has failed to satisfy the requirements of Federal Rule of Civil Procedure 65 to warrant the issuance of a temporary restraining order.

As a result, it is:

**ORDERED** that the Application for Temporary Restraining Order (Doc. 8) is **DENIED**.

Signed on August 26, 2026.

Fernando Rodriguez, Jr.
Fernando Rodriguez, Jr.
United States District Judge

**EXHIBIT L**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **TIM WALZ, *et al.*,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Civil Action No. 1:26-CV-00906** |
| **v.** | § | |
| | § | |
| **GREG ABBOTT, *et al.*,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**DECLARATION OF FIELD OFFICE DIRECTOR PATRICK DIVVER**

I, Patrick Divver, declare as follows:

1. I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as Field Office Director (FOD) with the San Diego Field Office. I have held the position of FOD since July 2025. Prior to serving as FOD of the San Diego Field Office, I was the Deputy Field Office Director of the Washington Field Office, in an acting capacity from July 2022 through March of 2023 when I took on the role on a permanent basis. I have been employed by ICE since 2006 and have held various supervisory and non-supervisory positions since that time.

2. As FOD of the San Diego Field Office, I direct ERO operations of over 545 employees in the San Diego and Imperial counties of southern California. I supervise ERO staff, review operational reports, and ensure compliance with DHS and ICE policies. I receive regular briefings and written updates from DHS and ICE personnel regarding, among other things, enforcement activities, and uses of force, among many other duties.

GOVERNMENT EXHIBIT A

3. The statements contained in this declaration are based upon my personal knowledge, reasonable inquiry, and information made available to me in the course of my official duties from information obtained from records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS.

4. On January 15, 2026, I was detailed on temporary duty (TDY) as the ERO Director of Operations for Operation Metro Surge (OMS) in St. Paul/Minneapolis, Minnesota. In this capacity, I managed all aspects of ERO's enforcement activities in the operation, including personnel management. Many other employees of ICE were detailed on TDY to that location at or about the same time, including Deportation Officer (DO) Christian Castro.

5. The purpose of this declaration is to inform this Court about the events that led to DO Castro being ordered back to his home office in Texas from his temporary duty location in the Minneapolis/St. Paul area.

6. On January 15, 2026, as Director of Operations for OMS, I learned of a use of force (UoF) incident involving Deportation Officer Christian Castro.

7. Upon my receiving notice of the UoF incident, I directed DO Castro, through his chain of command, to return to his duty field office in Harlingen, Texas, after I conferred with ERO senior leadership. DO Castro had no discretion in this matter. The direction to return to Texas was based upon concerns for DO Castro's personal safety and the safety of other ICE officers in Minnesota because, at the time of this incident, there were many protestors following ICE officers and using aggressive and sometimes violent tactics, including doxxing, to interfere with officers carrying out their duties. Additionally, DO Castro's partner, a witness to the UoF incident, was similarly directed home on the same date for the same reasons as DO Castro.

8. After the UoF incident, DO Castro had to be brought to a hospital many miles away to avoid protestors and DO Castro's presence in the area after the UoF incident would likely have made him and other ICE personnel around him a target of protestors. It was my general practice during OMS to send TDY officers back to their home office if they were involved in an incident that had the potential to impact officer or public safety.

9. On the same day as I learned of the UoF incident, I directed that travel be arranged for DO Castro to return to his home office in Texas. Based upon a review of his ticketed itinerary, the ticket for DO Castro's flight from Minneapolis to Texas with the ultimate destination of Harlingen, Texas was issued at government expense on January 15, and his travel occurred on January 16, 2026.

10. At the time of the direction to return to Texas, there were no criminal charges pending against DO Castro.

Executed on this 24th day of August 2026.

Patrick Divver
Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement