**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| **STATE OF MINNESOTA,**<br><br>**v.**<br><br>**CHRISTIAN J. CASTRO,**<br><br>***Defendant.*** | **No. 26-CR-189 (JMB)** |

## STATE OF MINNESOTA'S OPPOSITION TO DEFENDANT'S NOTICE OF REMOVAL

On the evening of January 14, 2026, Defendant Christian Castro, who is employed as an agent with the U.S. Immigration and Customs Enforcement ("ICE"), was pursuing a fleeing motorist ("Victim 2") along with other ICE agents. Victim 2 drove to his home and exited his vehicle, where another individual with whom he lives ("Victim 1") was waiting for him in the front yard. The defendant pursued and tackled Victim 2, and a brief skirmish followed that lasted only approximately 14 seconds, all of which were captured on video. During those few seconds, the victims each briefly grabbed and held brooms, but they did not make any physical contact with the defendant with those objects. They then fled inside the residence, where they started to close and lock the door. After Victim 1 and Victim 2 were already inside the home, the defendant fired a gunshot through the door, hitting Victim 1 in his right leg. The defendant later made numerous false statements about the incident, which are contradicted by the video of the encounter and other physical and testimonial evidence. As a result of his actions and lies, the defendant has been indefinitely suspended by ICE. He has also been charged by the federal government with making materially false statements.

For his conduct, the State of Minnesota separately has charged the defendant under Minnesota law with several counts of second-degree assault with a dangerous weapon and one count of falsely reporting a crime. The defendant now seeks to remove his state criminal case to federal court. To do so, the defendant unsuccessfully attempts to transform his unauthorized and unlawful conduct into a necessary and proper exercise of federal authority.

In our federal system, however, states retain primary criminal law-enforcement responsibility. *See Mesa v. California*, 489 U.S. 121, 138 (1989). Consistent with a state's sovereign interest in protecting its residents and in adjudicating state-law offenses in state court, the federal-officer removal statute does not permit removal of any or every case against a federal officer to federal court. Instead, a federal-officer defendant may remove a state prosecution to federal court only by establishing *both* a sufficiently close connection between the charged conduct and his federal authority *and* a colorable federal defense.

The defendant's removal notice is deficient on both fronts. The defendant fails to explain how firing his weapon through the door of an occupied residence, and then lying about that conduct, bears a sufficient connection to his lawful duties as a federal immigration agent. He equally fails to offer a plausible account of why the Supremacy Clause immunizes his conduct as either necessary or proper to carry out his federal immigration duties. Because the defendant's removal notice rests on unsupported claims and is insufficient to meet the requirements of the federal-officer removal statute, the Court should remand this case to state court. If the Court does not "order . . . summary remand," 28 U.S.C. § 1455(b)(4), it must promptly hold an evidentiary hearing, *id.* § 1455(b)(5). There, the defendant must make a "detailed showing," *Willingham v. Morgan*, 395 U.S. 402, 409 n.4 (1969), and bears the burden to establish his entitlement to removal.

Any such hearing would demonstrate what is already evident from the defendant's notice: that this case belongs in state, not federal, court.

# I. BACKGROUND

## A. Relevant Facts[1]

The defendant is an Enforcement and Removal Operations ("ERO") agent with ICE. On January 14, 2026, shortly before 7:00 p.m., a motorist ("Victim 2") was working for DoorDash and encountered ICE agents, who began pursuing him in an unmarked pickup truck. The defendant and other ICE officers pursued Victim 2 for an estimated 25 minutes over highways and streets across Minneapolis. Victim 2 drove to his home, where he lives with Victims 1, 3, and 4 (all adults) and two young children. After receiving a call from Victim 2 about the pursuit, Victim 1, who was at home, waited in the front lawn holding a snow shovel.

Once Victim 2 arrived home, he exited his car and ran toward his house. The defendant, now alone, pursued him. Seeing Victim 2 running toward the house, Victim 1 tossed the shovel aside, where it remained on the ground throughout the rest of the incident. Victim 2 slipped on the ice in front of the home, and the defendant tackled him. At that point, Victim 1 attempted to pull Victim 2 away from the defendant. Victim 2 momentarily broke free, but the defendant grabbed him again. Victim 1 then picked up and swung a broom at the defendant, missing him. Victim 2, when out of the defendant's grasp, grabbed a different broom and held it like a baseball bat. Victim 2 did not, however, swing the broom, nor did he use it to make any physical contact with the defendant, before tossing the broom to the ground.

[1] Unless otherwise noted, all facts are drawn from the Statement of Probable Cause appended to the Complaint, which is available at ECF No. 1-1 at 4–8.

After getting free of the defendant, Victim 1 and Victim 2 ran inside the home, where Victim 1 began to close and lock the door behind them. Already inside were Victims 3 and 4; they were in the front foyer, on their way up a staircase leading to the second floor. The defendant then fired a shot through the door into the home, hitting Victim 1 in his right leg. All four victims ran upstairs and barricaded themselves inside a room until federal authorities entered the home and took Victim 1 and Victim 2 into custody.

Video footage capturing the incident showed that approximately 14 seconds elapsed from when the defendant tackled Victim 2 until the defendant fired a shot into the Victims' home.

The defendant made several statements to federal investigators after the incident. He claimed that he had struggled with three individuals. The defendant further stated that, while tussling with Victim 2, one person struck him in the face with a broom, and another with a snow shovel. The defendant described the struggle as lasting "for about three minutes." The defendant claimed that one individual passed a broom to another individual, and that the individual who had taken the broom used it to strike the defendant repeatedly in the face or head while the defendant was lying on his back. In the defendant's telling, he used one hand to block the strikes while reaching with his other hand for his firearm. The defendant told authorities that the three individuals began fleeing when they saw his gun. He claimed that, while he was still lying on his back or sitting on the ground, he fired in the direction of the fleeing individuals, who then ran inside the house and closed the door.

Based on an FBI affidavit summarizing the defendant's account, the federal government filed federal felony assault charges against Victim 1 and Victim 2 two days after the incident. *See* Complaint, *United States. v. Aljorna & Sosa-Celis*, No. 26-mj-23-PAM-DLM (D. Minn. Jan. 16, 2026), ECF No. 1 (attached as Exhibit 1). Less than a month later, however, the government

moved to dismiss the charges with prejudice. *See* Government's Motion to Dismiss Complaint with Prejudice, *United States v. Aljorna & Sosa-Celis*, No. 26-mj-23-PAM-DLM (D. Minn. Feb. 12, 2026), ECF No. 48 (attached as Exhibit 2). That motion noted that "[n]ewly discovered evidence [was] materially inconsistent with the allegations in the Complaint Affidavit," and that "dismissal will serve the interests of justice." *Id.* The motion was granted. *See* Order, *United States v. Aljorna & Sosa-Celis*, No. 26-mj-23-PAM-DLM (D. Minn. Feb. 13, 2026), ECF No. 49 (attached as Exhibit 3).

On September 2, 2026, the federal government charged the defendant with six counts of making a materially false statement, in violation of 18 U.S.C. § 1001. *See United States v. Castro*, No. 26-cr-152-DFW-ECW (D. Minn.). Those charges remain pending.

### B. Procedural History

On May 18, 2026, the Hennepin County Attorney's Office charged the defendant with four counts of second-degree assault with a dangerous weapon and one count of falsely reporting a crime. *See* ECF No. 1-1 at 1–2. The defendant made his first appearance on those charges on September 17, 2026.[2] On October 20, 2026, he filed the notice of removal at issue here.

## II. LEGAL STANDARD

"[T]he regulation of crime" in our federal system "is pre-eminently a matter for the States." *Mesa*, 489 U.S. at 138 (quoting *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981)); *see id.* ("[I]t goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government."). This "traditional state authority" to investigate and prosecute "local criminal activity," *Bond v. United States*, 572 U.S. 844, 858 (2014) (quoting

[2] As the defendant describes, a prolonged extradition battle between Minnesota and Texas ensued after Minnesota charged the defendant with criminal violations of state law. *See* ECF No. 1 at 8–11. Those proceedings have no relevance to the question of removal and are not recounted here.

*United States v. Morrison*, 529 U.S. 598, 618 (2000)), contributes to a "compelling state interest in conducting criminal trials in the state courts," *Willingham*, 395 U.S. at 409 n.4. Accordingly, the Supreme Court has "identified a strong judicial policy against federal interference with state criminal proceedings." *Mesa*, 489 U.S. at 138 (quoting *Manypenny*, 451 U.S. at 243).

Against this backdrop, the federal-officer removal statute, 28 U.S.C. § 1442, permits removal of a state prosecution of a federal officer to federal court only where the defendant establishes that: (1) he is a federal officer; (2) the conduct charged is for "any act done under color of [his federal] office," *id.* § 1442(a)(1); and (3) he can assert a colorable federal defense, *Mesa*, 489 U.S. at 133. On the second prong, a defendant must demonstrate a sufficient "causal connection" between the charged conduct and his official federal authority. *Minnesota v. Am. Petroleum Inst.*, 63 F.4th 703, 715 (8th Cir. 2023); *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 738 (8th Cir. 2021). A federal-officer defendant also may show he was acting under color of his office by demonstrating that he protected an individual in his presence from "a crime of violence"; "provided immediate assistance to an individual who suffered, or who was threatened with, bodily harm"; or "prevented the escape of any individual who the officer reasonably believed to have committed, or was about to commit, in the presence of the officer, a crime of violence that resulted in, or was likely to result in, death or serious bodily injury." 28 U.S.C. § 1442(c). On the third prong, for a defendant's asserted federal defense to be sufficiently "colorable" to justify removal, it must be "plausible." *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001). Only where a defendant has established all three prongs does a federal court have jurisdiction to preside over a state prosecution. *Am. Petroleum Inst.*, 63 F.4th at 714; *Mesa*, 489 U.S. at 136.

It is the defendant's burden to establish that removal is warranted. *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 620 (8th Cir. 2010) ("The [removing] defendant bears the burden of

establishing federal jurisdiction by a preponderance of the evidence."). The defendant thus "must allege the underlying facts supporting each of the requirements for removal jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014). Removal is not warranted based on a defendant's self-serving or conclusory assertions alone, and a court need not accept allegations that are wholly unsupported. *See Georgia v. Clark*, 23-cv-3721, 2023 WL 7012663, at *5 n.11 (N.D. Ga. Sept. 29, 2023), *aff'd on other grounds*, 119 F.4th 1304 (11th Cir. 2024).[3]

Indeed, where "the non-removing party appropriately challenges the facts as set forth in the notice of removal," the defendant "must support [his] factual averments by competent proof." *New York v. Trump*, 683 F. Supp. 3d 334, 343 (S.D.N.Y. 2023) (cleaned up). If the court does not summarily remand a case based on a facial deficiency in the notice, 28 U.S.C. § 1455(b)(4), it must order an evidentiary hearing on the question of removal "to be held promptly," and then "make such disposition of the prosecution as justice shall require," *id.* § 1455(b)(5).

## III. ARGUMENT

The State of Minnesota has charged the defendant for shooting through a door into a home where four adults were located and for lying to law enforcement officers afterward about what had

---

[3] Citing *Jefferson County v. Acker*, 527 U.S. 423, 432 (1999), the defendant argues (ECF No. 1 at 14) that this Court must "credit" his "theory of the case" for removal purposes. But that argument is doubly flawed. First, in *Acker*, the Supreme Court credited the defendant's legal theory concerning the appropriate reading of a disputed municipal ordinance only to avoid "decid[ing] the merits of [that] case." 527 U.S. at 432. In context, *Acker* thus stands only for the uncontroversial proposition that courts should not "demand[] an airtight case on the merits" before removing a case, *id.*—not that a court should uncritically accept the defendant's self-serving account of contested facts. Second, a defendant must still support any "theory of the case" he offers with a "detailed showing," *Willingham*, 395 U.S. at 409 n.4, which the defendant here has failed to provide. *See also Colorado v. Symes*, 286 U.S. 510, 520 (1932) ("The burden is on the accused to submit a 'candid, specific and positive' statement of the facts so that the court will be able to determine the validity of his claim for removal."); *Maryland v. Soper*, 270 U.S. 9, 35 (1926) ("In order to justify so exceptional a procedure, the person seeking the benefit of it should be candid, specific and positive in explaining his relation to the transaction growing out of which he has been indicted, and in showing that his relation to it was confined to his acts as an officer.").

occurred. For two independent reasons, this matter belongs in Minnesota state court. First, the defendant cannot show he is charged for an act taken under color of his federal office, as he fails to assert a sufficient connection between his conduct—firing a gun into an occupied house and lying to law enforcement—and his official federal authority.[4] Second, the defendant also cannot assert any plausible federal defense for conduct that was unwarranted and plainly unreasonable under the circumstances. If the Court does not summarily remand this case based on these deficiencies in the defendant's notice, it should promptly hold an evidentiary hearing requiring the defendant to support his claims with "competent proof." *Trump*, 683 F. Supp. 3d at 343.

**A. Defendant Castro was not acting under color of federal office.**

"Not every act of . . . a federal officer is an act under color of office." *Trump*, 683 F. Supp. 3d at 345. Even if on duty at the time of the charged conduct—and thus able to avail himself of his service weapon—the defendant must show a sufficient relationship between the conduct and his federal authority. *Minnesota v. Weber*, 589 F. Supp. 2d 1170, 1173 (D. Minn. 2008) ("[I]t is not enough for a federal employee to simply allege that at the time of the incident she was 'on duty and acting in the course and scope of her federal employment.'" (quoting *Mesa*, 489 U.S. at 123)); *see also Symes*, 286 U.S. at 520 (denying removal of state homicide case even where defendant officer originally encountered victim while investigating federal prohibition violations); *Georgia v. Meadows*, 88 F.4th 1331, 1347–48 (11th Cir. 2023) (finding state's election-interference charges concerned conduct unrelated to defendant's federal duties, even when undertaken while defendant was on duty as President's chief of staff and at his place of employment); *Georgia v. Waller*, 660 F. Supp. 952, 954 (M.D. Ga. 1987) (explaining that a federal court does not have "jurisdiction over

[4] The State does not dispute that the defendant is a federal officer and thus that he has satisfied the first prong of the removal test.

any state criminal offense merely because it was committed by a federal official while on duty"). Indeed, "to justify so exceptional a procedure" as removal of a state criminal case to federal court, the defendant must be "candid" and "specific" in "showing that his relation to [the charged conduct] was confined to his acts as an officer." *Soper*, 270 U.S. at 35.

The defendant's acts of firing a gun through a door at the people behind it and then lying about the events that occurred leading up to the shooting do not "relat[e] to any act under color" of his federal immigration-enforcement authority. 28 U.S.C. § 1442(a)(1). Indeed, the defendant "cannot possibly demonstrate that his federal duties required him" either to fire his weapon at two men who had just run away from him into an apartment or to lie afterward about what had happened. *Illinois v. Zidek*, 691 F. Supp. 1177, 1178 (N.D. Ill. 1988). To the contrary, an ICE agent may only use deadly force when he "has reasonable grounds to believe that such force is necessary to protect the designated immigration officer or other persons from the imminent danger of death or serious physical injury." 8 U.S.C. § 287.8(a)(2)(ii). Deadly force "shall not be used solely to prevent the escape of a fleeing subject." Alejandro N. Mayorkas , *Update to the Department Policy on the Use of Force*, 8 (Feb. 6, 2023), https://www.dhs.gov/sites/default/files/2023-02/23_0206_s1_use-of-force-policy-update.pdf. And DHS employees are subject to discipline, including firing, for lying. *See, e.g.*, *Lachance v. Erikson*, 522 U.S. 262, 268 (1998) ("a government agency may take adverse action against an employee because the employee made false statements in response to an underlying charge of misconduct"); *Thomas v. Johnson*, 788 F.3d 177, 178 (5th Cir. 2015) (Border Patrol agent fired for "lack of candor" regarding possible hazing incident); *Nguyen v. DHS*, 737 F.3d 711, 713 (Fed. Cir. 2013) (deportation officer suspended for, among other things, lack of candor in a police investigation). In short, the defendant's "duty . . . did not require, nor even permit," the criminal

acts for which he is charged; "[t]here is, therefore, no causal connection between the [the defendant's] official acts and the criminal allegations he is charged with under state law." *Waller*, 660 F. Supp. at 954.

Painting with a broad brush, the defendant asserts that there is a sufficient causal connection between the charged conduct and his federal authority because "[e]very charged act occurred during–and only because of–Officer Castro's attempt to apprehend Victim 2 under federal immigration law." ECF No. 1 at 15. This assertion is flawed both factually and legally. The defendant did not shoot his gun until his (unsuccessful) attempt to seize Victim 2 had ended and both Victim 1 and Victim 2 entered their residence, and he did not lie about the circumstances surrounding the shooting until even later. Thus, neither his act of shooting through a door into a residence occupied by four people nor his subsequent lies occurred "during" his attempt to detain Victim 2. And even if the defendant's illegal acts occurred "because of" his attempt to enforce immigration laws, mere but-for causation is insufficient to establish the requisite causal connection necessary for an act to be under color of office. *See Chevron USA Inc. v. Plaquemines Par.*, 608 U.S. 1, 12 (2026) ("The ordinary understanding of 'relating to' requires a connection that is not tenuous, remote, or peripheral." (some quotation marks omitted)); *Soper*, 270 U.S. at 41-43 (rejecting government's argument that, if the officers "had not been engaged in the performance of their duties as federal officers they would never have been there," and holding that the acts must be more "closely connected with, and included in, the attempted enforcement of the federal law").

The defendant's reliance (ECF No. 1 at 16) on Section 1442(c) fares no better. The defendant was neither protecting anyone in his presence from a crime of violence nor assisting anyone who had suffered or was threatened with bodily harm. *See* 28 U.S.C. § 1442(c)(1)–(2). The defendant also was not attempting to "prevent[ ] the escape of any individual who [he]

reasonably believed to have committed, or was about to commit, in the presence of the officer, a crime of violence that resulted in, or was likely to result in, death or serious bodily injury." *Id.* § 1442(c)(3); *see generally id.* § 1442(d)(2) ("The term 'crime of violence' has the meaning given that term in section 16 of title 18."). There is no suggestion that the defendant suffered "death or serious bodily injury," and "wield[ing] a broom toward" someone, ECF No. 1 at 16, is not likely to result in that kind of injury. And although the defendant claims (*id.*) that Victim 1 and Victim 2 violated 18 U.S.C. § 111(a)—despite the charges against them having been dismissed with prejudice—a violation of that statute is not a "crime of violence." *See United States v. McIntosh*, 189 F.4th 680, 684 (8th Cir. 2026) ("a felony conviction under § 111(a)(1) is not categorically a crime of violence"); *United States v. Diaz*, 865 F.3d 168, 178-79 (4th Cir. 2017) (citing cases holding that § 111(a)(1) "is categorically not a crime of violence").

There is likewise no merit to the defendant's attempt to characterize the self-serving lies he told after committing an entirely unjustified shooting as having been "part of the federal enforcement action." ECF No. 1 at 16. The defendant nowhere claims that his statements were truthful; to the contrary, the defendant admits (*id.* at 9 n.6) that he has been separately charged in federal court with six counts of making a false statement, in violation of 18 U.S.C. § 1001(a)(2), based on his description of his interaction with Victim 1 and Victim 2. *See* Indictment, *United States v. Castro*, No. 26-cr-152-DFW-ECW (D. Minn. 2026), ECF No. 1.[5] Rather than "relat[ing]

[5] Specifically, the federal indictment alleges that (1) the defendant claimed Victim 1 hit him with a broom, when no person struck him with a broom; (2) the defendant claimed a third person hit him with a shovel, when no third person was involved and nobody struck him with a shovel; (3) the defendant claimed Victim 2 hit him with a broom, when no person struck him with a broom; (4) the defendant claimed he tried to block strikes from the broom to his face, when no person struck the defendant with a broom; (5) the defendant claimed he fired his gun at the men while seated on the ground or lying on his back, when the defendant was standing when he fired; and (6) the defendant claimed he wrestled with Victim 2 for approximately three minutes, when the interaction lasted for approximately 11 seconds. *See* Indictment at 4–8.

to any act under color" of his duties as a federal immigration officer, 28 U.S.C. § 1442(a)(1), the defendant's lies were antithetical to those duties. *See, e.g.*, *Thuestad v. v. Police Board of City of Chicago*, No. 1-23-1909, 2024 WL 4456665, at *9 (Ill. App. Ct. Oct. 10, 2024) (officer's intentional falsification of an official police report was "antithetical to that expected and required of a police officer, who at all times has a duty to act with honesty and integrity"); *Mondragon v. Police Board of City of Chicago*, No. 1-21-0068, 2022 WL 2325518, at *4 (Ill. App. Ct. June 28, 2022) (officer's "fail[ure] to provide truthful, accurate, consistent, and complete statements of what she had observed" was "antithetical to that expected and required of a sworn law enforcement officer"). Indeed, the defendant was suspended indefinitely for his conduct in this case, in part because "it is fundamental for a [federal law enforcement officer] to demonstrate candor and integrity," but the defendant did not do so, and instead "falsely claimed to the Federal Bureau of Investigation (FBI) that an assailant repeatedly struck [him] with a broom while [the defendant was] lying on the ground, and that [the defendant] later fired a shot at him and others before they entered a residence." Letter from Juan E. Delgado, Field Office Director, ICE ERO, to Christian Castro (July 16, 2026) (attached as Exhibit 4). It is thus immaterial that the defendant made his false statements to other federal officers while he was still outside Victim 1's and Victim 2's residence. *See* ECF No. 1 at 17–18. The defendant "had no official authority" to lie to other ICE agents and his "official duties [did not] include" telling lies. *Meadows*, 88 F.4th at 1349. Because the defendant's lies were not "done 'in enforcement of federal law,'" but were instead contrary to it, those acts are not "attributable to exercises of [the defendant's official] authority." *Id.* (quoting *Mesa*, 489 U.S. at 131–32).

In sum, neither the defendant's federal immigration duties nor the specified circumstances identified in § 1442(c) permitted the defendant to fire a bullet through a door at the people behind

it and then lie about the events that occurred before the shooting. He has therefore not satisfied the removal requirement that he acted under color of federal office, and the Court can remand this case on that basis alone.

**B. The defendant has not asserted a colorable federal defense.**

Removal is inappropriate here for a second reason: the defendant does not assert a colorable federal defense. Although he gestures at various defenses that he says are "subspecies" of a "broader immunity defense," he does not expound upon those defenses or explain why they are "colorable" in this case. *See* ECF No. 1 at 12 (briefly mentioning, without further discussion, "the authority conferred by 8 U.S.C. § 1357," "official-duty self-defense," "official-duty defense of others," and "the federal standard governing an immigration officer's use of force" and "applicable . . . use-of-force policy"). Instead, the defendant focuses solely on arguing that he may claim immunity under the Supremacy Clause of the U.S. Constitution. *Id.* at 19–24.

But "[f]ederal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law." *Symes*, 286 U.S. at 518. To make out a valid Supremacy Clause immunity defense, the defendant must show *both* that he was performing "an act which he was authorized to do by the law of the United States," and that in performing that duty, he "did no more than what was necessary and proper for him to do." *In re Neagle*, 135 U.S. 1, 75 (1890); *Kentucky v. Long*, 837 F.2d 727, 744 (6th Cir. 1988). The defendant fails to meet each prong.

**i. Authorized by law**

First, for the reasons that he cannot establish that he was acting under color of his federal authority, *see supra* at 8-13, the defendant cannot plausibly claim that the charged conduct falls within the scope of that federal authority. Although the defendant notes (ECF No. 1 at 14) that as

an immigration agent he had the authority to carry out surveillance and enforcement operations in the Twin Cities area, any such authority did not encompass firing shots into an occupied home and lying when asked about what happened. 8 U.S.C. § 1357(a)(5) (describing the limited nature of ICE enforcement authority); 8 C.F.R. § 287.5(c) (same). Similarly, though the defendant claims (ECF No. 1 at 10) the uncontested authority "to carry his service weapon and to use force, including deadly force," and to ensure his and others' safety, such authority does not convert firing into a home or lying to law enforcement officers into an exercise of federal authority.

**ii. Necessary and proper**

Second, the defendant fails to advance a colorable claim that he "did no more than what was necessary and proper for him to do." *In re Neagle*, 135 U.S. at 75. To merit the protections of Supremacy Clause immunity, the defendant must do more than "merely recit[e] the magic words 'necessary and proper'"; he must instead come forward with "underlying facts" that "make out a colorable federal defense." *North Carolina v. Ivory*, 906 F.2d 999, 1001 n.4 (4th Cir. 1990). But the defendant's account relies on irrelevant facts and is insufficient to show it was reasonable or necessary for him to shoot into a house he knew to be occupied and then to lie about it. *See Wyoming v. Livingston*, 443 F.3d 1211, 1220-22 (10th Cir. 2006) (discussing cases interpreting "necessary and proper" prong of Supremacy Clause immunity test to be asking whether the conduct was "necessary and justifiable" or "reasonable and necessary"); *cf. Graham v. Connor*, 490 U.S. 386, 397 (1989) (under the Fourth Amendment, an officer's use of force must be "'objectively reasonable' in light of the facts and circumstances confronting" the officer).

The defendant's shooting into the house after Victim 1 and Victim 2 had already retreated inside was not necessary or proper to fulfill any federal duty. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend

him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see also Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir. 2008) ("Since 1985, it has been established by the Supreme Court that the use of deadly force against a fleeing suspect who does not pose a significant threat of death or serious physical injury to the officer or others is not permitted."). That principle decides this case. At best, Victim 1 and Victim 2 amounted to fleeing "suspects," though the federal government has affirmatively disavowed any claim that those Victims have committed any federal offense. *See supra* at 4-5. The defendant indisputably used deadly force against them—and against the home's other occupants—when he discharged his service weapon into the home into which Victim 1 and Victim 2 fled. But the defendant does not and could not plausibly claim that Victim 1 and Victim 2 posed an "immediate threat" to him or others. The defendant's "decision[] to use deadly force" was therefore "objectively unreasonable." *Moore*, 514 F.3d at 762-63.

Resisting that straightforward conclusion, the defendant lists (ECF No. 1 at 21–22) seven factual claims that he contends support the conclusion that he acted reasonably when deciding to fire a shot into the occupied house where the Victims were located. None of those claims comes close to establishing that the defendant's decision to fire shots into the home was "no more than what was necessary and proper for him to do" to carry out his federal immigration duties. *In re Neagle*, 135 U.S. at 75. Some factual claims bear no relevance at all. *See* ECF No. 1 at 21 (noting that Victim 2 had called occupants of the home, who in turn had called 911); *id.* at 21–22 (noting that Victim 1 "had been standing on the front lawn holding a snow shovel" when the defendant arrived at the address). Others make clear that the defendant understood that the Victims were fleeing. *See id.* at 21 (noting that Victim 2 "had fled from ICE officers by car and then on foot"); *id.* at 22 (noting that both Victim 1 and Victim 2 "retreated in a residence whose occupants and

contents were unknown" to the defendant). But the defendant advances no claim—and none would be plausible—that he thought the retreating Victims posed an "immediate threat" to him or others at the moment that he fired a shot toward them through the door.

The conduct at issue in this case is nothing like what happened in the cases on which the defendant relies. Citing two cases, he claims that a federal-officer defendant's use of deadly force may be reasonable when it occurs "during a rapidly evolving struggle with a fleeing suspect." ECF No. 1 at 22 (citing *New York v. Tanella*, 374 F.3d 141 (2d Cir. 2004), and *Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017)). But in *Tanella*, the court granted immunity to an officer who believed his life was in danger because, after pursuing the victim in a high-speed chase through a residential neighborhood, the officer was engaged in hand-to-hand combat with the victim, who was fleeing with a bag of cocaine, had repeatedly struck the officer, and who the officer believed was reaching for the officer's firearm at the time that the officer used deadly force. 374 F.3d at 152. And in *Kleinert*, the federal-officer defendant engaged in an extended pursuit of a suspect, and then, while hitting the suspect with his gun, "accidentally pulled the trigger" and killed the suspect. 855 F.3d at 310. The defendant nowhere suggests that his deliberate use of force after the Victims had retreated inside the house was necessary to protect his life or mere accident.

The defendant's bare claim that he "honestly and reasonably believed that his actions were reasonable," ECF No. 1 at 22,[6] does not suffice to establish a colorable federal defense. Even those courts that consider whether the federal officer "subjectively believe[d] that his action [wa]s justified" also require that the "belief [was] objectively reasonable." *Tanella*, 374 F.3d at 147. In other words, whatever the defendant claims (without proof) that he subjectively believed about his

[6] In recounting what he believes to be the relevant facts, the defendant likewise "aver[s] that he subjectively believed his conduct was justified and in furtherance of his duties as a federal agent." ECF No. 1 at 5 n.1.

decision to deploy deadly force into the residence where the Victims were located, he cannot establish a colorable Supremacy Clause immunity defense—let alone actually succeed on such a claim—unless he can demonstrate that his purported subjective belief was objectively reasonable. And for the reasons given above, the defendant fails to make this showing.

That the defendant lied to law enforcement officers about what occurred additionally undercuts his claimed subjective belief that what he did was necessary or proper. *Cf.* ECF No. 1 at 23 (acknowledging that the defendant's "inconsistent" "account" could be offered as evidence of "bad faith"). And just as the defendant can offer no plausible explanation of how lying about his on-the-job conduct falls within the scope of his federal duties, so too he cannot colorably contend that lying was either necessary or proper. Indeed, as discussed above, *see supra* at 5, the defendant's lies were not just unnecessary and unreasonable, but they were both antithetical to his duties as a federal law-enforcement officer and constituted crimes. As ICE recognized when suspending the defendant for his actions in this case, those actions were "contradictory to the mission of the Agency." Letter from Juan E. Delgado, Field Office Director, ICE ERO, to Christian Castro (July 16, 2026) (attached as Exhibit 4). The defendant thus cannot establish that his actions were necessary and proper to carry out his duties as a federal law-enforcement officer.

Likely recognizing the weakness of his argument, the defendant falls back on the claim (ECF No. 1 at 23–24) that the Court must accept his theory of the case at this stage in the removal proceedings. But that is incorrect. As explained above, *see supra* at 7 n.3, the defendant's cited authority, *Acker*, teaches only that courts at the removal stage must avoid "demanding an airtight case on the merits" of an officer's asserted federal defense. 527 U.S. at 432. Nothing in *Acker* or elsewhere supports the defendant's notion that this Court should blindly accept his self-serving *ipse dixit* regarding the facts of the incident underlying the charged conduct—particularly where

the defendant's account is contradicted by clear video evidence and has prompted federal false-statement charges. "*Acker* does not instruct [courts] to eschew [their] duty of independent judicial review." *Meadows*, 88 F.4th at 1346. Rather, "judicial duty demands an independent assessment" of the plausibility of any asserted federal defense, *id.*, and the defendant is "obligated to support the factual averments linking his conduct and his office by competent proof," *id.* at 1348 (internal quotations omitted). Indeed, in other cases addressing state-law charges for the use of deadly force by federal officers, the Supreme Court has repeatedly confirmed that "[t]he burden is on the accused to submit a 'candid, specific, and positive' statement of the facts," after which the court must then "determine the validity" of the defendant's version of events by assessing "whether his claim of immunity rests on any substantial basis or is made in good faith." *Symes*, 286 U.S. at 520-21 (quoting *Soper*, 270 U.S. at 34–35); *see also Willingham*, 395 U.S. at 409 n.4 (citing *Symes* and *Soper* with approval and explaining that a criminal defendant must make a "detailed showing" to support his claim to removal).

Here, however, the required "candid . . . statement" and "competent proof" of a colorable federal defense are entirely lacking. Castro cannot plausibly explain why either shooting through a door into an occupied residence or lying about that action was "no more than what was necessary and proper for him to do" as a federal immigration agent. *In re Neagle*, 135 U.S. at 75. This Court is thus empowered to determine—including after an evidentiary hearing, should it deem one necessary, *see* 28 U.S.C. § 1455(b)(5)—that the defendant's claim to Supremacy Clause immunity does not "rest on any substantial basis" and is not "made in good faith," *Symes*, 286 U.S. at 521, such that this prosecution must be remanded to state court.

## IV. CONCLUSION

The unsupported claims in the defendant's notice do not support removal. The defendant has neither established that the charged conduct in this case was for an act taken under color of his federal office nor presented a colorable federal defense. The Court therefore should remand this prosecution to the district court for Hennepin County. To the extent the Court does not order summary remand, it should promptly hold an evidentiary hearing and then remand the case.

Dated: October 30, 2026

Respectfully Submitted,

MARY F. MORIARTY
Hennepin County Attorney

/s/ *Joshua R. Larson*
JOSHUA R. LARSON (#0388828)
MORGAN D. KUNZ (#0396177)
MEHEK MASOOD (#0400562)*
HENNEPIN COUNTY ATTORNEY'S OFFICE
300 S. 6th St.
Minneapolis, MN 55487
(612) 348-8952
joshua.larson@hennepincounty.gov
morgan.kunz@hennepincounty.gov
mehek.masood@hennepincounty.gov

* *Admission pending*

/s/ *James I. Pearce*
JAMES I. PEARCE* (D.C. Bar No. 90042280)
SAMANTHA P. BATEMAN* (VA Bar # 80110)
WASHINGTON LITIGATION GROUP
1717 K Street NW
Washington, DC 20006
(202) 521-8750
jpearce@washingtonlitigationgroup.org

* *Pro hac vice application pending*

*Counsel for State of Minnesota*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2026, a true and accurate copy of the State of Minnesota's Opposition to Defendant's Notice of Removal was filed electronically with the Court's CM/ECF filing system, which will then send notification of such filing to the parties.

This 30th day of October, 2026.

/s/ *Joshua R. Larson*
JOSHUA R. LARSON
HENNEPIN COUNTY ATTORNEY'S OFFICE
300 S. 6th St.
Minneapolis, MN 55487
(612) 348-8952
joshua.larson@hennepincounty.gov